# No. 23-50452

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RONNIE DIAZ, JR.,
*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Western District of Texas, No. 5:21-cr-2

———————

## BRIEF OF APPELLANT
## RONNIE DIAZ, JR.

———————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
Tel.: (210) 472-6700
Fax: (210) 472-4454

CARL R. HENNIES
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

### UNITED STATES v. RONNIE DIAZ, JR.,
### No. 23-50452

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Ronnie Diaz, Jr.,** Defendant-Appellant;

2. **Jaime Esparza,** U.S. Attorney;

3. **Ashley Hoff** and **Gregg Soffer,** former U.S. Attorneys;

4. **Tiffany Miller, Fidel Esparza III,** and **Mary Nelda Valadez,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

5. **Maureen Scott Franco,** Federal Public Defender;

6. **Marina-Thais Douenat,** Assistant Federal Public Defender, who represented Defendant-Appellant in the district court; and

7. **Carl R. Hennies,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Carl R. Hennies
CARL R. HENNIES
*Attorney for Defendant-Appellant*

i

## REQUEST FOR ORAL ARGUMENT

Diaz raises two challenges to his conviction for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1): a Second Amendment challenge and a Commerce Clause challenge. Although the second of these issues is foreclosed by this Court's precedent, the first issue would benefit from oral argument because it involves an intervening Supreme Court decision—*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)— that abrogates this Court's precedent.[1]

---

[1] Diaz is aware of at least five cases pending in this Court in which the same issue was preserved below: *United States v. Collette*, No. 22-51062 (briefing complete; placed in abeyance pending decision in *United States v. Rahimi*, No. 22-915 (U.S.)); *United States v. Charles*, No. 23-50131 (briefing complete; government's motion to place case in abeyance pending *Rahimi* denied August 29, 2023); *United States v. Grinage*, No. 23-50261 (briefing complete); *United States v. Melendrez-Machado*, No. 23-50506 (briefing in progress); and *United States v. Bullock*, No. 23-60408 (briefing in progress).

# TABLE OF CONTENTS

Request for oral argument ................................................................. ii

Table of authorities ........................................................................ v

Jurisdiction ..................................................................................... 1

Statement of the issue .................................................................... 2

Statement of the case ..................................................................... 2

Summary of the argument ............................................................. 6

Argument ........................................................................................ 8

I.   Section 922(g)(1) violates the Second Amendment .................... 8

   A.  Standard of Review. ............................................................ 8

   B.  *Bruen* abrogated the Second Amendment framework
      previously employed by circuit courts after *Heller* .............. 9

      1.  The Second Amendment's plain text covers the
         conduct prohibited by § 922(g)(1): possession of a
         firearm. ....................................................................... 11

      2.  Felons are among "the people" protected by the
         Second Amendment. ................................................... 12

      3.  The government cannot show that § 922(g)(1) is
         "consistent with the Nation's historical tradition of
         firearm regulation." ................................................... 16

         a.  The history of categorical firearms restrictions
            does not support disarming felons. ..................... 20

         b.  There is no evidence of "distinctly similar"
            founding-era regulations disarming all felons.... 26

         c.  The government cannot satisfy the "relevantly
            similar" inquiry either. ....................................... 31

C.  Under the same framework, § 922(g)(1) violates the
    Second Amendment as applied to felons like Diaz. ........... 34

II. Section 922(g)(1) is unconstitutional because it exceeds
    Congress' power to regulate interstate and foreign
    commerce. .................................................................... 36

    A.  Standard of review. ............................................ 36

    B.  Section 922(g)(1) exceeds Congress' power to regulate
        interstate and foreign commerce. ..................... 37

Conclusion ...................................................................... 43

# TABLE OF AUTHORITIES

## Cases

*Alderman v. United States,*
  562 U.S. 1163 (2011) ............................................................ 38, 39

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................................*passim*

*Hollis v. Lynch,*
  827 F.3d 436 (5th Cir. 2016) ........................................................ 9

*Industrial Union Dept., AFL-CIO v. American Petroleum Institute,*
  448 U.S. 607 (1980) .................................................................... 40

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) ..................................... 14, 21, 23, 27

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ..........................................................9, 11, 14

*Medina v. Whitaker,*
  913 F.3d 152 (D.C. Cir. 2019) ......................................... 29, 32, 33

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ........................................................ 39, 40, 41

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,*
  *Firearms & Explosives,*
  700 F.3d 185 (5th Cir. 2012) ..................................................... 9, 28

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022) ............................................................*passim*

*NLRB v. Noel Canning,*
  573 U.S. 513 (2014) .................................................................... 19

*Range v. Att'y Gen.,*
  69 F.4th 96 (3d Cir. 2023) ......................................... 13, 15, 35, 36

*Scarborough v. United States,*
  431 U.S. 563 (1977) ........................................................ 29, 37, 41

*United States v. Alcantar,*
   733 F.3d 143 (5th Cir. 2013) .................................................. 38, 42

*United States v. Booker,*
   644 F.3d 12 (1st Cir. 2011).................................................... 28, 29

*United States v. Bullock,*
   2023 WL 4232309 (S.D. Miss. June 28, 2023) ........................... 35

*United States v. Daniels,*
   77 F.4th 337 (5th Cir. 2023) ............................................... *passim*

*United States v. Hill,*
   927 F.3d 188 (4th Cir. 2019) ....................................................... 38

*United States v. Knowles,*
   29 F.3d 947 (5th Cir. 1994) ......................................................... 36

*United States v. Kuban,*
   94 F.3d 971 (5th Cir. 1996) ......................................................... 38

*United States v. Lopez,*
   514 U.S. 549 (1995) ............................................................. 37, 42

*United States v. Massey,*
   849 F.3d 262 (5th Cir. 2017) ......................................................... 8

*United States v. McGinnis,*
   956 F.3d 747 (5th Cir. 2020) .................................................... 9, 10

*United States v. Morrison,*
   529 U.S. 598 (2000) ................................................................... 42

*United States v. Rahimi,*
   61 F.4th 443 (5th Cir. 2023) ............................................... *passim*

*United States v. Seekins,*
   2022 WL 3644185 (5th Cir. Aug. 24, 2022) ............................... 37

*United States v. Seekins,*
   52 F.4th 988 (5th Cir. 2022) ................................................. 38, 39

*United States v. Sitladeen,*
   64 F.4th 978 (8th Cir. 2023) ....................................................... 15

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ...................................................... 30

*United States v. Toure*,
   965 F.3d 393 (5th Cir. 2020) ...................................................... 36

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ..................................................................... 13

*United States v. Williams*,
   616 F.3d 685 (7th Cir. 2010) ...................................................... 29

## Constitutional Provisions

U.S. Const. amend. II .................................................................*passim*

U.S. Const. art. I, § 8, cl. 3 ........................................................... 37

## Statutes

18 U.S.C. § 922(g) ......................................................................... 19

18 U.S.C. § 922(g)(1) ...............................................................*passim*

18 U.S.C. § 922(g)(8) ..................................................................... 23

18 U.S.C. § 924(c) ............................................................................. 3

18 U.S.C. § 3231 ............................................................................... 1

18 U.S.C. § 3742(a) .......................................................................... 1

21 U.S.C. § 841(a)(1) ........................................................................ 3

21 U.S.C. § 841(b)(1)(A) ................................................................. 3

28 U.S.C. § 1291 ............................................................................... 1

Act of May 8, 1792,
   1 Stat. 271 ..................................................................................... 27

Act of Oct. 3, 1961,
   Pub. L. No. 87-342, 75 Stat. 757 ............................................... 25

Constitution and Laws of the State of New-Hampshire,
Act of Dec. 28, 1792 (1805) .......................................................... 27

Federal Firearms Act of 1938,
75 Cong. Ch. 850, § 2(e), 52 Stat. 1250 ...................................... 25

Gun Control Act of 1968,
Pub. L. 90-618, 82 Stat. 1213 ...................................................... 25

Herty, Digest of the Laws of Maryland,
"Militia," §§ 7, 15, 19, 20 (1799) ................................................ 27

Laws of the State of Delaware,
ch. XXXVI, §§ 1, 2, 4 (1797) ........................................................ 27

Marbury, Digest of the Laws of the State of Georgia,
Act of December 24, 1792, §§ 9–10 (1802) ................................. 27

Mitchell, Statutes at Large of Pennsylvania,
Act of March 20, 1780, §§ III, XXI (1700–1809) ........................ 27

Public Statute Laws of the State of Connecticut,
Title CXII, ch. I, §§ 1, 10 (1808) ................................................ 27

Thomas Greenleaf, Laws of the State of New-York,
Act of April 4, 1786 (1792) .......................................................... 27

Wright & Potter, 7 Acts and Laws
of the Commonwealth of Massachusetts, 1780–1805, ch. 14
(1898) ............................................................................................ 27

## Rules

Fed. R. App. P. 4(b)(2) ..................................................................... 1

Fed. R. Crim. P. 52(b) ..................................................................... 36

## Other Authorities

Adam Winkler,
*Heller's Catch-22*,
56 UCLA L. Rev. 1551 (2009) ......................................... 25, 27, 30

Alice Ristroph,
  *The Second Amendment in a Carceral State*,
  116 Nw. U. L. Rev. 203 (2021) ....................................................... 21

C. Kevin Marshall,
  *Why Can't Martha Stewart Have A Gun?*,
  32 Harv. J.L. & Pub. Pol'y 695 (2009) ........................................ 28

Carlton F.W. Larson,
  *Four Exceptions in Search of a Theory:* District of Columbia v.
  Heller *and Judicial Ipse Dixit*,
  60 Hastings L.J. 1371 (2009) ....................................................... 28

Joseph G. S. Greenlee,
  *The Historical Justification for Prohibiting Dangerous Persons
  from Possessing Arms*,
  20 Wyo. L. Rev. 249 (2020) ...................................................*passim*

Nelson Lund,
  *The Second Amendment,* Heller*, and Originalist Jurisprudence*,
  56 UCLA L. Rev. 1343 (2009) ..................................................... 25

Robert H. Churchill,
  *Gun Regulation, the Police Power, and the Right to Keep Arms in
  Early America*,
  25 Law & Hist. Rev. 139 (2007)...................................... 22, 24, 32

## JURISDICTION

This is an appeal from a final judgment in a criminal case alleging a violation of federal law. The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered its judgment on July 18, 2023. ROA.304. Diaz appealed on June 12, 2023. ROA.291; *see* Fed. R. App. P. 4(b)(2). This Court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Title 18 U.S.C. § 922(g)(1) categorically bars all felons from possessing firearms "in or affecting commerce" or which have been "shipped or transported in interstate or foreign commerce." Diaz's conviction under this statute presents two issues:

**1.** Does § 922(g)(1) violate the Second Amendment?

**2.** Does § 922(g)(1) exceed Congress' powers under the Commerce Clause? (Foreclosed).

## STATEMENT OF THE CASE

Diaz raises two challenges to his conviction of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *First*, the district court erred by denying his motion to dismiss the indictment because the statute is unconstitutional under the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Second*, the statute exceeds Congress' power under the Commerce Clause. That issue is foreclosed by precedent; Diaz raises it to preserve it for further review by the Supreme Court.

**1.** Diaz is a convicted felon. He has a prior state conviction for being a felon in possession of a firearm. ROA.478. This case arises

from a traffic stop in San Antonio, Texas, where officers alleged that Diaz was driving a car with two different temporary dealer tags. ROA.241. During the stop, the officers smelled marijuana. ROA.378. Officers asked Diaz to exit his vehicle to investigate further and, as they were frisking him, he stated that he was a felon out on bond and that he had bullets in his pocket. ROA.242. A subsequent search of the car revealed a firearm matching the bullets found in Diaz's pocket and bags containing 495.7 grams of methamphetamine. ROA.477–78. The firearm had "travelled in interstate and foreign commerce." ROA.478.

**2.** Diaz was charged in a three-count indictment with (1) possessing with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); (2) possessing a firearm during an in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); and (3) being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).

**3.** Diaz moved to dismiss count three of the indictment, arguing that "§ 922(g)(1) is unconstitutional under the Second Amendment, both facially and as applied to [him], under the new standard announced by the Supreme Court in *New York Rifle & Pistol Ass'n,*

*Inc. v. Bruen.*" ROA.143. He argued that the charged conduct—possession of a firearm commonly used for self-defense—is protected by the plain text of the Second Amendment. ROA.144, 147–49. The statute is facially unconstitutional, Diaz argued, because the government cannot satisfy its burden, under *Bruen*, of establishing that § 922(g)(1) is consistent with the Nation's history of firearm regulation. ROA.149–53. Alternatively, Diaz argued that § 922(g)(1) is unconstitutional as applied to him because his criminal history does not suggest that he is dangerous. ROA.154–55.

The district court denied Diaz's motion to dismiss. ROA.221–31. In denying Diaz's facial challenge, the court noted that *Bruen* reaffirmed earlier Supreme Court holdings that the right to bear arms is subject to certain restrictions, including prohibitions on felons from carrying firearms. ROA.226. Next, the court rejected Diaz's as-applied challenge because § 922(g)(1) does not distinguish between violent and nonviolent offenders and other courts have consistently applied § 922(g)(1) to nonviolent offenders. ROA.227–30.

**4.** Diaz proceeded to a stipulated bench trial. ROA.439–47. The parties submitted a written stipulation of facts establishing the elements of § 922(g)(1) (as well as counts one and two). ROA.447–

4

79. The stipulation stated that it "does not foreclose [Diaz's] right to appeal his conviction" and that Diaz "explicitly reserves his right to appeal his conviction and the Court's order denying his …motion to dismiss." ROA.479. The district court found Diaz guilty on all three counts. ROA.275–76.

    **5.**   The district court sentenced Diaz to 120 months on each of counts one and three (to run concurrently) and 60 months on count two (to run consecutively) for a total sentence of 180 months. ROA.305, 459. The district court also sentenced Diaz to five years of supervised release. ROA.306, 459.

    **6.**   Diaz appealed. ROA.291.

## SUMMARY OF THE ARGUMENT

**1.** Diaz's conviction for being a felon in possession of a firearm should be reversed because 18 U.S.C. § 922(g)(1) unconstitutionally infringes on his rights under the Second Amendment, both facially and as applied to him. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court reaffirmed that the Second Amendment right to bear arms is not a second-class right. 142 S. Ct. 2111, 2156 (2022). The Court rejected decades of "judicial deference to legislative interest balancing" in the form of means-end scrutiny in Second Amendment jurisprudence. *Id.* at 2131. Instead, it announced that a modern firearm regulation's constitutionality depends only on the Second Amendment's text and historical understanding.

Under this new framework, § 922(g)(1) violates the Second Amendment. The statute impacts the core Second Amendment right to possess a firearm for self-defense. This right belongs to all "the people" under the Constitution, including felons. And the government cannot meet its burden to show § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation. There is no relevant historical evidence of categorically disarming felons.

**2.**  Diaz also preserves for further review by the Supreme Court his argument, foreclosed by circuit precedent, that § 922(g)(1) exceeds Congress' power to regulate interstate commerce because that statute permits a conviction based only on the manufacture of the firearm or ammunition outside the state in which it was possessed.

## ARGUMENT

### I.   Section 922(g)(1) violates the Second Amendment.

The district court erred by denying Diaz's motion to dismiss his felon-in-possession charge. Section 922(g)(1) criminalizes firearm possession by any person convicted of a crime punishable by more than a year in prison. Although this Court has held that § 922(g)(1) does not violate the Second Amendment, *see*, *e.g.*, *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017), those decisions pre-date *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment claims. So *Bruen* is an intervening Supreme Court decision that has implicitly overruled this Court's precedent because it "fundamentally change[d] the focus of the relevant analysis." *United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023) (cleaned up). This Court should apply *Bruen* and hold § 922(g)(1) unconstitutional both facially and as applied to Diaz.

### A.   Standard of Review.

The Court reviews constitutional challenges to a statute *de novo*. *See United States v. Daniels*, 77 F.4th 337, 341 (5th Cir. 2023).

**B.** ***Bruen* abrogated the Second Amendment framework previously employed by circuit courts after *Heller*.**

The Second Amendment to the United States Constitution mandates that a "well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008), the Supreme Court held that the Second Amendment codifies an individual right to possess firearms, the "central component" of which is self-defense. *See Bruen*, 142 S. Ct. at 2133 (citing *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)).

After *Heller*, this Court "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). In the first step, courts would ask "whether the conduct at issue falls within the scope of the Second Amendment right." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012)). This involved determining "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* at 754. If the conduct was

outside the scope of the Second Amendment, then the law was constitutional. *Id*. Otherwise, courts proceeded to the second step, to determine whether to apply strict or intermediate scrutiny. *Id*. That means-end framework has now been repudiated by the Supreme Court. *See Bruen*, 142 S. Ct. at 2127; *see also Rahimi*, 61 F.4th at 450.

In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment claims, abrogating the two-step inquiry adopted by this Court and others. *See Rahimi*, 61 F.4th at 450. *Bruen* rejected the second step of that framework because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Bruen*, 142 S. Ct. at 2127. *Bruen* reasoned that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. Under *Bruen*'s framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126. The government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. Only then may a

court conclude that the individual's conduct falls outside of the Second Amendment's "unqualified command." *Id*.

### 1.  The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1): possession of a firearm.

Section 922(g)(1) permanently disqualifies all felons from exercising the fundamental right to possess firearms for self-defense. The district court correctly concluded that Diaz's conduct in carrying a personal firearm is covered by the plain text of the Second Amendment. ROA.227. As a result, § 922(g)(1) is presumptively unconstitutional. *See Bruen*, 142 S. Ct. at 2129–30.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. The plain text—"keep and bear arms"—means possessing and carrying weapons. *Heller*, 554 U.S. at 583–92. *Bruen* clarified that the core right to possess and carry a firearm for self-defense, identified in *Heller* and *McDonald*, extends outside the home. 142 S. Ct. at 2122. Section 922(g)(1) is a complete ban on all firearm possession, without regard to the type of firearm or the way it is used. It therefore infringes upon the core Second Amendment right to possess a firearm for self-defense. *See McDonald*, 561 U.S. at 767; *see also Rahimi*, 61 F.4th at 454

(possession of rifles and pistols, weapons "in common use today," "easily falls within the purview of the Second Amendment").

The sole question at this stage of the *Bruen* analysis is whether "conduct" is covered by the plain text of the Second Amendment. 142 S. Ct. at 2126. Because firearm possession is conduct covered by the Second Amendment, it is presumptively protected.

### 2.  Felons are among "the people" protected by the Second Amendment.

The Second Amendment covers felons by recognizing that the right to keep and bear arms belongs to "the people." U.S. Const. amend. II. The plain text does not limit who is included in "the people." *See id.* The text simply says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *Id.* The Supreme Court has confirmed that "'the Second Amendment right is exercised individually and belongs to *all* Americans.'" *Daniels*, 77 F.4th at 342 (quoting *Heller*, 554 U.S. at 581, and adding emphasis). So whether a category of person can be disarmed is a question of historical tradition and falls under the second *Bruen* step, not the Second Amendment's plain text.

*Heller* rejected the theory that "the people" protected by the Second Amendment were limited to a subset—those in a militia. 554 U.S. at 579–81, 592–600. *Heller* explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 580–81.

Like the First, Fourth, and Ninth Amendments, the Second Amendment codified an individual right. *Id.* at 579–80. This is distinguishable from other Constitutional provisions for "collective" actions by "the people," like voting, which enumerate the civic exercise of powers, not rights. *Id.* Individual rights extend to "the people," or a "'class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of the community.'" *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Categorically excluding felons from the plain text of the Second Amendment would, therefore, endanger felons' basic protections under the First and Fourth Amendments. *Range v. Att'y Gen.*, 69 F.4th 96, 101–02 (3d Cir. 2023) (en banc). It also would run afoul of

*Bruen*'s directive that the Second Amendment is "not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality op.)).

One sitting Justice has explained that this language from *Heller* means that a person's status is properly considered in the question of historical tradition, rather than the existence of the right. In *Kanter v. Barr*, then-Judge Barrett observed that, under *Heller*, the word "people" refers to "all Americans," meaning that felons are not "categorically excluded from our national community." 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). The "question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id*. Thus, a person's status as a felon is properly considered in the historical tradition inquiry and does not affect whether the person has a Second Amendment right. *Id.* at 451–52.

This Court has now twice rejected the government's attempts to limit "the people" protected by the Second Amendment to only "law-abiding, responsible citizens." *See Daniels*, 77 F.4th at 342–43; *Rahimi*, 61 F.4th at 451–53. While acknowledging the Supreme Court's use of the term "law-abiding, responsible citizens," *Daniels*

14

explained that "we cannot read too much into the Supreme Court's chosen epithet." 77 F.4th at 342; *see also Range*, 69 F.4th at 101 (noting that the references to "law-abiding, responsible citizens" in *Heller*, *McDonald*, and *Bruen* were dicta).

This Court reiterated *Heller*'s conclusion that the Second Amendment right "belongs to all Americans." *Daniels*, 77 F.4th at 342; *Rahimi*, 61 F.4th at 451–52. The Court also endorsed Justice Barrett's reasoning in *Kanter v. Barr* that any "law-abiding" qualifier would relate to the power to restrict a right, not the scope of the right itself. *Daniels*, 77 F.4th at 343 & n.2; *Rahimi*, 61 F.4th at 452–53; *see also United States v. Sitladeen*, 64 F.4th 978, 986 (8th Cir. 2023) (reading *Rahimi* to require consideration of a person's status at the historical, second step of *Bruen*). Indeed, *Daniels* discusses the historical "strip[ping]" of rights, not the absence of rights. 77 F.4th at 343. Both longstanding prohibitions and groups historically stripped of their rights involve a historical analysis. Any alternative reading would contradict *Rahimi*'s and *Daniels*'s reiteration of *Heller*, endorsement of Justice Barrett's approach in *Kanter*, and rejection of the "law-abiding" gloss proffered by the government below. *See Daniels*, 77 F.4th at 342–43; *Rahimi*, 61 F.4th at 451–53.

Because the Second Amendment right belongs to "all Americans," *Heller*, 554 U.S. at 580–81, § 922(g)(1)'s categorical ban on an individual's possession of a firearm based on their status as a felon is presumptively unconstitutional under the plain text of the Second Amendment at the first stage of the *Bruen* analysis. Whether a category of people can be disarmed is a question of historical tradition, which is the government's burden under *Bruen*.

### 3. The government cannot show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation."

Because the plain text of the Second Amendment covers § 922(g)(1), the burden shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. *Bruen* described three metrics by which the sufficiency of the historical precedent should be analyzed: temporal proximity to the founding era, similarity to the challenged restriction, and breadth. *Id.* at 2130–34, 2136, 2138.

*First*, regarding temporal proximity to the founding era, "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were

understood to have *when the people adopted them.*" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35; emphasis in *Bruen*). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the intervening years."[2] *Id.* Similarly, the Court explained that "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* The Court expressed skepticism about reliance on laws passed long after the passage of the Second Amendment and explained, "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137.

*Second*, the founding-era historical precedent must be comparable to the challenged regulation. How similar the historical precursors must be to the challenged law depends on the societal

_____

[2] The Fourteenth Amendment was implicated in *Bruen* because the Fourteenth Amendment imposes the Second Amendment's protections on a state regulation or law. The Supreme Court did not hold that, for a challenge to a federal statute, regulations from around the passage of the Fourteenth Amendment (1868) would carry the same weight as those from around ratification of the Second Amendment (1791). *See Bruen*, 142 S. Ct. at 2137–38; *see also id.* at 2163 (Barrett, J., concurring). Indeed, *Bruen* acknowledged that 19th century evidence was secondary to that from the Nation's founding, *see id.* at 2137, and its value is even more limited when addressing a federal statute.

problem it seeks to address. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the government must identify distinctly similar historical regulations. *Bruen*, 142 S. Ct. at 2131. The "lack of a distinctly similar historical regulation addressing that problem" or evidence that earlier generations addressed the societal problem through materially different means "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* The total handgun ban in *Heller* and public-carry restriction in *Bruen* involved this type of "straightforward" historical inquiry. *Id.*

*Bruen*'s historical analysis demonstrates that "distinctly similar" means the regulations are nearly identical or meaningfully the same. In contrast, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy …." *Id.* Whether a historical regulation is a proper analogue for a uniquely modern regulation turns on whether they are "relevantly similar," based in part on how and why the regulations burden the Second Amendment right. *Id.* at 2132–33. But this "nuanced approach"

only applies to "modern regulations that were unimaginable at the founding." *Id.* at 2132. As this Court phrased the inquiry in *Rahimi*, regarding a different provision in § 922(g), whether the historical precedents are "relevantly similar" depends on a comparison of how the laws restricted the right to bear arms and why the burden was so placed, neither requiring a "historical twin" nor accepting an analogue that "remotely resembles" current law but "risks endorsing outliers that our ancestors never would have accepted." *Rahimi*, 61 F.4th at 454 (quoting *Bruen*, 142 S. Ct. at 2132–33).

*Third*, the government must show "a tradition of broadly prohibiting" conduct in the manner of the challenged restriction. *Bruen*, 142 S. Ct. at 2138. In other words, the founding-era historical evidence must show "a governmental practice has been open, widespread, and unchallenged since the early days of the Republic." *Id.* at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)). The government cannot "simply posit that the regulation promotes an important interest." *Id.* at 2126. Nor can it rely on "outlier" historical restrictions. *Id.* at 2133, 2156. Indeed, *Bruen* "doubt[ed] that *three* colonial regulations could suffice to show a tradition." *Id.* at 2142. Moreover, it is incumbent on the government, not the

Court, to provide the record of this broad historical tradition. *See id.* at 2130 n.6, 2150.

The government cannot meet its burden here because there is no historical tradition, particularly from the founding era, of disarming all felons.

### a. The history of categorical firearms restrictions does not support disarming felons.

Reviewing historical examples of categorical restrictions on firearm possession—in other words, wholesale disarmament of a particular category of person—sets the proper backdrop for the *Bruen* analysis of temporal proximity to the founding era, similarity to the challenged restriction, and breadth. While there is some limited historical evidence of disarming certain specific categories of people, none support finding § 922(g)(1) constitutional.

Historical analyses of firearms rights and regulations generally begin with pre-founding English common law, though *Bruen* cautions against placing undue emphasis on English laws, particularly laws that long predate this Nation's founding. *See Bruen*, 142 S. Ct. at 2138–39. As early as the 15th and 16th centuries, English law targeted potentially disloyal communities,

including Catholics and the Welsh, for disarmament. *See* Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 257–65 (2020). In the Restoration period following the English Civil War of the mid-17th century, the Stuart monarchs more aggressively disarmed political and religious dissidents. *See Heller*, 554 U.S. at 592–93. For example, the Militia Act of 1662 permitted disarming those adjudged to be "dangerous to the Peace of the Kingdom"; the 1671 Game Act involved disarmament of those who did not own property, particularly in Protestant regions; and forfeiture of "armour" could be ordered for those who went "armed to terrify the King's subjects." *Id.*; *see Kanter*, 919 F.3d at 457 (Barrett, J., dissenting).

Following the Glorious Revolution in 1688, a Convention of elected representatives drafted the Declaration of Rights—a predecessor to the Second Amendment codified as the English Bill of Rights—which included that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by law." *See Heller*, 554 U.S. at 593; Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021). Almost immediately thereafter, Parliament began disarming Catholics viewed as potential dissidents. *See Heller*, 554 U.S. at 593.

Indeed, through the 18th century, England targeted "papists and other disaffected persons, who disown his Majesty's government," for disarmament, to quell concerns over potential rebellions and insurrections. *See* Greenlee at 260–61. The most discernable English tradition prior to American independence was the disarmament of religious dissidents perceived as threatening to the crown. *See id.* at 257–61.

In the American colonies during the 17th and 18th centuries, categorical disarmament was largely reserved for Indians, indentured servants, slaves, black freedmen, and others outside of the "body politic." *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 156–58 (2007). Scholars have likewise recognized a trend of disarming individuals who voluntarily excluded themselves from that "body politic" by refusing to swear allegiance, first to the crown, and later to the American Revolution and newly established states and commonwealths. *Id.* at 157–61. As in England, the colonial period also included examples of disarming individuals based on their religion, where religious expression was deemed seditious or incompatible with loyalty to the sovereign. *See* Greenlee at 263.

The Second Amendment was ratified in 1791. The codification of the right repudiated the attempted disarmament of disloyal colonists, much like its English precursor was a rejection of the disarmament of dissidents in Restoration-era England. *See Heller*, 554 U.S. at 592–95, 598. Commentary immediately following ratification illustrates the view that certain restrictions from the English Restoration were inconsistent with the right that was ultimately codified in the Second Amendment. *See id.* at 606–08. And while the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions included proposals to limit the right to "peaceable citizens" or to expressly permit disarmament for those in "rebellion" or for "crimes committed," this language was not included in the Second Amendment itself.[3] *See Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting).

---

[3] In *Rahimi*, this Court rejected the use of many of these historical English and colonial era laws with regard to the restriction on possession of firearms by those subject to protective orders, but did so by focusing on the clear dissimilarities between those laws and that specific provision, including that these earlier English and colonial-era laws were targeted at preserving the social and political order generally, and not at the protection of individuals by the threat posed by another, and that other laws proffered by the government were based on criminal proceedings rather than the civil proceedings underlying § 922(g)(8)'s prohibition. 61 F.4th at 457.

Historical evidence from the period immediately surrounding ratification is entitled to significant weight under *Bruen*. While some categorical firearms restrictions persisted during this time, scholars have noted the period was marked by less burdensome temporary restrictions and the ability to have firearms rights restored. *See* Greenlee at 268–70. For example, some religious dissidents in the Massachusetts Bay Colony had their rights restored after expressing contrition, and even those who engaged in an armed rebellion in Massachusetts were only subjected to a three-year prohibition on bearing arms. *Id*.

By the 19th century, "prohibitions on arms possession were mostly discriminatory bans on slaves and freedmen" or on targeted disfavored groups like "tramps." Greenlee at 269–70. But these prohibitions, like earlier laws, did not disarm felons as a class. After a full survey of printed session laws on gun regulation, history professor Robert H. Churchill concluded: "[A]t no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Churchill at 142, 143 n.11.

It was not until the 20th century that legislatures began to pass modern, categorical firearms bans, including on felons. *See* Greenlee at 272–75. Congress passed the first version of the modern federal firearm ban for violent felons in 1938, expanding it to include non-violent felons in 1961 and all possession in 1968.[4] State laws disarming felons were, likewise, first adopted in the early 20th century. *See* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar).

A brief review of English and early American historical categorical firearms restrictions evinces a troubling tradition of disarming religious and political dissidents and targeted minority communities, but not felons. The Second Amendment is properly understood as a repudiation of many of these oppressive

---

[4] *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed); Act of Oct. 3, 1961, Pub. L. No. 87-342, 75 Stat. 757 (repealed); Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).

regulations, rather than an endorsement of such categorical restrictions. But insofar as the United States incorporated any tradition of categorical exclusion, it assuredly did not include the targeted disarmament of felons until the 20th century.

### b. There is no evidence of "distinctly similar" founding-era regulations disarming all felons.

Turning to the *Bruen* framework, the government must provide historical examples of regulations that are "distinctly similar" to § 922(g)(1) because, as in *Heller* and *Bruen*, the restriction does not address "unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132–33. Section 922(g)(1) bans firearm possession by all felons. Crime and felons have existed since the founding. So too has the presumed "societal concern" addressed by § 922(g)(1): felons possessing firearms. The government cannot therefore rely on the "nuanced approach" of "analogical reasoning" using "relevantly similar" analogues. *See Bruen*, 142 S. Ct. at 2132. The "relevantly similar" inquiry is reserved for statutes addressing uniquely modern problems that would have been "unimaginable" at the founding. *See id.*

There are no "distinctly similar" founding-era laws demonstrating a tradition of broadly prohibiting firearm possession by felons.[5] *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (noting that scholars have not been able to identify any founding-era laws disarming all felons); *see also* Winkler at 1563 ("The Founding generation had no laws … denying the right to people

---

[5] To the contrary, there is considerable evidence that felons were included among those citizens to whom the Second Amendment was expressly directed. Even though the right protected by the Second Amendment "does not depend on service in the militia," *Bruen*, 142 S. Ct. at 2127, it must extend to at least the pool of individuals from whom the militia would be drawn. And in the founding era, felons were part of the militia pool. Just one year after the ratification of the Second Amendment, Congress provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty five years … shall severally and respectively be enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271. The Act "exempted" certain class of people, but not felons. *Id.* § 2, 1 Stat. 272. Similar contemporaneous state militia statutes also failed to exempt felons. *See* Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134–36 (1797); Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808); Herty, Digest of the Laws of Maryland, "Militia," §§ 7, 15, 19, 20, at 367–70 (1799); Wright & Potter, 7 Acts and Laws of the Commonwealth of Massachusetts, 1780–1805, ch. 14, at 381–82, 389–90 (1898); Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251–52, 256 (1805); Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227–28, 232–33 (1792); Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700–1809); Marbury, Digest of the Laws of the State of Georgia, Act of December 24, 1792, §§ 9–10, at 350 (1802).

convicted of crimes."). The earliest firearm restrictions for felons in America were passed in the 20th century. *See, e.g.*, Greenlee at 272–75; C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009) ("Though recognizing the hazard of trying to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I."); Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009) ("As far as I can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century. The earliest such law was enacted in New York in 1897, and similar laws were passed by Illinois in 1919, New Hampshire, North Dakota, and California in 1923, and Nevada in 1925.").

The modern statutes that dispossess felons of firearms, including § 922(g)(1), bear "little resemblance to laws in effect at the time the Second Amendment was ratified." *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011); *see also Nat'l Rifle Ass'n of Am.*, 700 F.3d at 196. Reliance on the passage of § 922 itself to support its own historical tradition is logically circular and ignores *Bruen*'s

skepticism of 20th century historical evidence. *See Bruen*, 142 S. Ct. at 2137, 2154 n.28; *cf. Scarborough v. United States*, 431 U.S. 563, 569 (1977) (§ 922(g)(1)'s predecessor "was a last-minute amendment to the Omnibus Crime Control Act enacted hastily with little discussion and no hearings").

Before *Bruen*, courts often acknowledged the absence of founding-era felony restrictions. Yet they concluded that § 922(g)(1) was constitutional by relying on *Heller*'s dicta that prohibitions on felon firearm possession were "longstanding" or by applying means-end scrutiny that *Bruen* swept aside. *See, e.g., Booker*, 644 F.3d at 24 (noting that *Heller*, 554 U.S. 626–27 & n.16, did not cast doubt on longstanding prohibitions on firearm possession by certain individuals, including felons, which are presumptively lawful); *Medina v. Whitaker*, 913 F.3d 152, 159–60 (D.C. Cir. 2019) (same); *see also United States v. Williams*, 616 F.3d 685, 691–94 (7th Cir. 2010) (holding that § 922(g)(1) survives Second Amendment challenge under intermediate scrutiny).

This reasoning is irreconcilable with the framework laid out in *Bruen*, which expressly rejected the use of means-end scrutiny. *Bruen*, 142 S. Ct. at 2127–30. Moreover, the "longstanding prohibitions" language in *Heller* is dicta, and courts have cautioned

29

against reliance on it. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010); *see also* Winkler at 1567. *Bruen* requires the government to provide "distinctly similar" historical examples from the founding era to prove that a restriction on the Second Amendment right is consistent with the Nation's traditions. *See generally Bruen*, 142 S. Ct. 2111. *Heller* did not provide the historical basis for its "longstanding prohibitions" dicta, and *Bruen* acknowledged as much. *See Bruen*, 142 S. Ct. at 2128 (noting its prior caution that it was not undertaking an "exhaustive historical analysis … of the full scope of the Second Amendment"). *Bruen* did not carve out an exception to its framework for firearm restrictions for felons.[6] Courts are simply not permitted to disregard the framework laid out in *Bruen* based on dicta from *Heller*. If categorical prohibitions for felons are indeed "longstanding" and satisfy the newly articulated framework in *Bruen*, the government

---

[6] *Bruen*'s majority opinion is silent about this issue. Justice Kavanaugh, in a concurring opinion joined by Chief Justice Roberts, cited the "longstanding prohibitions" language from *Heller*. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Justice Alito also noted in a concurrence that the opinion did not disrupt the holdings of *Heller*. *Id.* at 2157 (Alito, J., concurring). But neither concurrence announced that § 922(g)(1) is constitutional or subject to a relaxed Second Amendment analytical framework.

would be able to identify specific "distinctly similar" historical examples of such a tradition. But it cannot.

The absence of founding-era laws specifically disarming felons forecloses the government's ability to show "distinctly similar historical regulation[s]" like § 922(g)(1).

### c. The government cannot satisfy the "relevantly similar" inquiry either.

In *Rahimi*, this Court appeared to adopt the "relevantly similar" standard for all forms of firearm regulation, regardless of whether the societal problem was of a long-standing nature. *See Rahimi*, 61 F.4th at 455–60. Even if the Court applied this more "nuanced approach," which should be reserved under *Bruen* for statutes addressing unprecedented modern problems, there is no evidence of "relevantly similar" firearms restrictions to § 922(g)(1) from the founding era. Courts that have upheld § 922(g)(1) since *Bruen* have largely eschewed the requirement to show specific similar historical regulations. Instead, many have relied on general arguments by the government that § 922(g)(1) is consistent with traditions of disarming other "unvirtuous" citizens. This is inconsistent with *Bruen*.

Even prior to *Bruen*, some courts relied on a purported tradition of disarming "unvirtuous" citizens to support modern felon disarmament laws. *See Medina*, 913 F.3d at 159 (collecting cases). Scholars have, however, noted the absence of historical support for this "virtuous citizen" theory. *See* Greenlee at 275–83. The earliest articles promoting the theory fail to cite to any historical evidence. *See id.* Rather, as described above, historical categorical disarmament was generally limited to disempowered minority communities—such as slaves and Indians—and those who evidenced disloyalty to the government. *See id.* at 261–65; Churchill at 156–61. Many of these types of categorical restrictions were rejected by the Second Amendment, but even those of arguable historical relevance do not "impose a comparable burden on the right" and are not "comparably justified" to § 922(g)(1)'s categorical disarmament of felons. *See Bruen*, 142 S. Ct. at 2133 (explaining metrics of comparing "relevantly similar" analogues). This Court has likewise expressed skepticism about reliance on these types of laws, which disarmed groups of people based on the repugnant historical view that they were excluded from "the people" protected by the Constitution. *Rahimi*, 61 F.4th at 457.

*Bruen* also expressly rejected the type of overly generalized reasoning employed under the "virtuous citizen" theory. In *Bruen*, the state of New York relied on a select few disparate historical restrictions on public carry of firearms for specific purposes or in specific sensitive places to establish a more general principle of limiting all public carry. 142 S. Ct. at 2135, 2142–50. Throughout *Bruen*, the Court reasoned that the respondents had "define[d] the category … far too broadly" and rejected the extrapolation of a broad tradition from a few narrow historical restrictions. *See id.* at 2134, 2150, 2156. The same is true here. Historical evidence of disarming slaves, Indians, and political opponents cannot be generalized to encompass all "unvirtuous" people—a term that mischaracterizes those historical categories and which would encompass considerably more categories than felons. The term lacks a limiting principle and is defined "far too broadly." *See id.* at 2134; *cf. Medina*, 913 F.3d at 159–60 (rejecting the similar "dangerousness standard" as too "amorphous ... to delineate the scope of the Second Amendment"). It also invites deference to legislatures to define the "unvirtuous" people and reliance on something like means-end scrutiny for courts to review that definition. Both were repudiated by *Bruen*. 142 S. Ct. at 2131.

The "virtuous citizen" theory therefore lacks historical support and is insufficient to demonstrate an historical tradition of regulations "relevantly similar" to § 922(g)(1), as required by *Bruen*.

*     *     *

The government cannot show historical evidence distinctly or relevantly similar to § 922(g)(1) that would illustrate a tradition of categorically disarming felons. Thus, it cannot overcome the presumption that § 922(g)(1) violates the Second Amendment. *See Bruen*, 142 S. Ct. at 2126. *Bruen*'s new analytical framework plainly applies to § 922(g)(1) and renders the statute violative of the Second Amendment. The Court should therefore reverse the district court's denial of Diaz's motion to dismiss and vacate his felon-in-possession conviction.

### C.  Under the same framework, § 922(g)(1) violates the Second Amendment as applied to felons like Diaz.

In an as-applied *Bruen* challenge, as in a facial challenge, the government must show that felons like Diaz were historically disarmed. *See Daniels*, 77 F.4th at 340 (finding no historical tradition of "disarming a sober citizen" like Daniels "based

34

exclusively on his past drug usage"); *Range*, 69 F.4th at 106 ("Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights."). This the government has not done and cannot do.

As discussed above, there is no historical evidence to support the proposition that felons, dangerous or otherwise, were disarmed at the founding. *See United States v. Bullock*, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023), *appeal pending* No. 23-60408 (5th Cir.) ("The government's violent-and-dangerous argument is also out of sequence, as the government still had not (and has not today) proven the predicate question: that there is a historical tradition of disarming either the violent or the dangerous."). Courts are skeptical of subjecting § 922(g)(1) challenges to this type of ambiguous and unworkable dangerousness test. *See, e.g., id.* at *28; *Range*, 69 F.4th at 104 n.9 ("We need not decide [whether dangerousness or violence is the touchstone] today because the government did not carry its burden to provide a historical analogue to permanently disarm someone like Range, whether grounded in dangerousness or not.").

Even if the government could show a historical tradition of disarming dangerous felons, such a tradition would not support permanently disarming Diaz because he does not have any violent felony convictions. *See* ROA.502–04; *Range*, 69 F.4th at 105–06 (holding § 922(g)(1) unconstitutional as applied to a non-violent felon). His criminal history consists of convictions for theft, possessing less than two ounces of marijuana, evading arrest, and possessing a firearm as a felon.

Because the government cannot show the requisite historical tradition, the Court should alternatively hold § 922(g)(1) unconstitutional as applied to Diaz. *See Range*, 69 F.4th at 106.

## II. Section 922(g)(1) is unconstitutional because it exceeds Congress' power to regulate interstate and foreign commerce.

### A.  Standard of review.

The Court reviews this issue, raised for the first time on appeal, using the plain-error standard of review. *United States v. Toure*, 965 F.3d 393, 399 (5th Cir. 2020); *see* Fed. R. Crim. P. 52(b). A conviction under an unconstitutional statute meets the plain error standard. *See United States v. Knowles*, 29 F.3d 947, 951–52 (5th Cir. 1994). That said, Diaz acknowledges that this issue is foreclosed. *See*

*United States v. Seekins*, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022) (per curiam) (unpublished) (summarizing precedent), *cert. denied*, 143 S. Ct. 2668 (2023). He raises it here for possible further review by the Supreme Court.

## B.   Section 922(g)(1) exceeds Congress' power to regulate interstate and foreign commerce.

Article I, § 8 of the United States Constitution provides: "Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court established the test for the scope of Congress' power to regulate activities that "affect" interstate commerce: "We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Lopez*, 514 U.S. at 559. *Lopez* seemed to, but did not expressly, overrule the more permissive test for federal regulation of gun possession articulated in *Scarborough v. United States*, which required only the "minimal nexus that the firearm have been, at some time, in interstate commerce." 431 U.S. 563, 575 (1977).

A fair reading of *Scarborough* suggests that the case was concerned solely with statutory interpretation and did not purport to resolve any constitutional issues. *See United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc). This Court has adhered to the view that *Scarborough*'s "minimal nexus" is sufficient both to prove guilt under § 922(g)(1) and to bring any subsequent act of firearm possession within Congress' power to regulate. *See*, *e.g.*, *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

Members of the Supreme Court and judges on lower courts have acknowledged the irreconcilability of *Lopez* and a constitutional reading of *Scarborough*. *See Alderman v. United States*, 562 U.S. 1163, 1166 (2011) (Thomas, J., dissenting from denial of certiorari) ("*Scarborough*, as the lower courts have read it, cannot be reconciled with *Lopez* ...."); *see also United States v. Hill*, 927 F.3d 188, 215 n. 10 (4th Cir. 2019) (Agee, J., dissenting) ("While some tension exists between *Scarborough* and the Supreme Court's decision in *Lopez*, the Supreme Court has not granted certiorari on a case that would provide further guidance ...."); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting in part) ("[T]he precise holding in *Scarborough* is in fundamental and

irreconcilable conflict with the rationale of [*Lopez*].”). Judge Ho’s opinion dissenting from denial of rehearing en banc in *Seekins*, 52 F.4th at 988–92, is the most recent and thorough objection to the established view.

If *Scarborough* is a constitutional decision, then it grants the federal government unlimited power to regulate the affairs of citizens. *See Alderman*, 562 U.S. at 1167 (Thomas, J., dissenting from denial of certiorari) (“[T]he lower courts’ reading of *Scarborough*, by trumping the *Lopez* framework, could very well remove any limit on the commerce power.”). Any physical object has almost certainly crossed a state line at some point in the past. To hold that this past travel grants Congress a perpetual right to regulate what someone does or does not do with that object is to eliminate any restrictions on Congress’ power. *See Nat’l Fed’n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 557 (2012) (Roberts, C.J.) (“The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.”).

This unlimited power renders § 922(g)(1) facially unconstitutional. In *NFIB*, Chief Justice Roberts noted that “[a]s expansive as our cases construing the scope of the commerce power

have been, they all have one thing in common: They uniformly describe the power as reaching '*activity*.'" 567 U.S. at 551 (emphasis added). He reasoned that this limitation of Commerce Clause power to "activities" is a "distinction between doing something and doing nothing [which] would not have been lost on the Framers, who were 'practical statesmen,' not metaphysical philosophers." *Id.* at 555 (quoting *Industrial Union Dept., AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 673 (1980) (Rehnquist, J., concurring in judgment)). Four other Justices echoed Chief Justice Roberts's sentiment regarding the Commerce Clause analysis, stating that Congress could only regulate "*activity* affecting commerce." *NFIB*, 567 U.S. at 658 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting).

Here, § 922(g)(1) does not require that Diaz's possession of the gun was an economic activity; this ought to be fatal to the conviction. As explained by *NFIB*, the Commerce Clause permits Congress to regulate only activities—in other words, the active participation in a market. But § 922(g)(1) criminalizes all possession, without reference to economic activity. Accordingly, it sweeps too broadly.

Further, the statute does not require that Diaz be engaged in the relevant market at the time of the regulated conduct. Chief

Justice Roberts also noted that Congress cannot regulate a person's activity under the Commerce Clause unless the person affected is "currently engaged" in the relevant market. *NFIB*, 567 U.S. at 556, 557 (Roberts, C.J.). As an illustration, the Chief Justice provided the following example: "An individual who bought a car two years ago and may buy another in the future is not 'active in the car market' in any pertinent sense." *Id.* at 556. As such, *NFIB* overrules the long-standing notion that a firearm which has previously and remotely passed through interstate commerce should be considered to affect commerce indefinitely without "concern for when the [initial] nexus with commerce occurred." *Scarborough*, 431 U.S. at 577.

Diaz thus was convicted under § 922(g)(1) without evidence that he was "currently engaged" in the gun market at the time of his arrest. So § 922(g)(1) fails to survive *NFIB*'s Commerce Clause analysis. The statute has been construed to require only that a firearm have traveled in interstate commerce at some previous time. *See Scarborough*, 431 U.S. at 575. If it cannot be construed to require commercial activity of some kind by the defendant— something more substantial than mere possession of an item that may have crossed state lines years ago—then it contains no

jurisdictional element sufficient to bring it within the terms of Congressional power. In the absence of such a jurisdictional element, the Supreme Court has found federal criminal statutes falling substantially outside the Commerce power to be unconstitutional without pausing to consider whether the particular conduct of the defendant might have affected commerce. *See Lopez*, 514 U.S. at 561; *United States v. Morrison*, 529 U.S. 598, 607 (2000). In other words, without such an element, comparable statutes have been found facially unconstitutional.

Diaz concedes that this argument was rejected in *Alcantar*, 733 F.3d at 145–46, among other cases, but raises it to preserve the issue for possible further review.

## CONCLUSION

The Court should reverse the district court's denial of Diaz's motion to dismiss and vacate his felon-in-possession conviction.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Carl R. Hennies
CARL R. HENNIES
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,158 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Carl R. Hennies
CARL R. HENNIES
*Attorney for Defendant-Appellant*

Dated: November 13, 2023