

**U.S. Department of Justice**

Criminal Division

*950 Pennsylvania Avenue N.W., Room 1252*
*Washington, DC 20530-0001*
*Tel: (202) 307-1982*

June 28, 2024

**VIA CM/ECF**

Mr. Lyle W. Cayce, Clerk
Office of the Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130

    Re:    *United States v. Ronnie Diaz, Jr.*, No. 23-50452
            Supplemental Letter Brief for the United States

Dear Mr. Cayce,

    The government submits this supplemental letter brief in response to the Court's June 21, 2024, order directing the parties to address the applicability of the Supreme Court's decision in *United States v. Rahimi*, No. 22-915, 2024 WL 3074728 (June 21, 2024), to this case. In *Rahimi*, the Supreme Court held that 18 U.S.C. § 922(g)(8), which prohibits firearm possession by an individual who is subject to a domestic violence restraining order, does not violate the Second Amendment on its face or as applied to the defendant in that case. *Rahimi*'s reasoning supports the government's position that 18 U.S.C. § 922(g)(1), which prohibits a person from possessing a firearm if he has been convicted of "a crime punishable by imprisonment for a term exceeding one year," comports with the Second Amendment. Section 922(g)(1) is consistent with the principles, rooted in our nation's historical tradition, that legislatures may disarm individuals who have been convicted of serious crimes, or whose firearm possession poses a risk of danger to themselves or others. *Rahimi* undermines Diaz's contrary arguments, which repeat the same methodological errors that *Rahimi* addressed. The district court's judgment should be affirmed.

I. **The Supreme Court's Decision in *Rahimi* Clarified the Analytical Framework Governing Second Amendment Challenges.**

In *Rahimi*, the Supreme Court upheld Section 922(g)(8) under the Second Amendment. The Court explained that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." 2024 WL 3074728, at *5. Those provisions include surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond," and going armed laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Id*. at *8-*9. The Court concluded that "[t]aken together, the surety and going armed laws confirm" that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id*. at *9. The Court acknowledged that "Section 922(g)(8) is by no means identical to these founding era regimes," but it explained that "it does not need to be": Section 922(g)(8)'s "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id*.

In reaching its decision, the Court clarified that its Second Amendment precedents do not demand "a law trapped in amber"; the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id*. at *6. As Justice Barrett emphasized in concurrence, "imposing a test that demands overly specific analogues has serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices," and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id*. at *30 (Barrett, J., concurring).

Accordingly, the Court explained that, when assessing whether a law complies with the Second Amendment, courts should consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id*. (emphasis added). Under this standard, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id*. But even "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster," so long as the law "comport[s] with the principles underlying the Second Amendment." *Id*.

II. ***Rahimi* Supports the Government's Position that Section 922(g)(1) is Consistent with History and Tradition.**

The government preserves its arguments that this Court's binding precedent forecloses Diaz's Second Amendment challenge to Section 922(g)(1), Gov't Br. 5-11; and that as a matter of constitutional text, individuals with felony convictions are

2

not among "the people" who possessed a "right to keep and bear arms," as those terms are historically understood, *id*. at 12-20. The Court's reasoning in *Rahimi* is fully consistent with these arguments, which the government maintains are independent bases for rejecting Diaz's Second Amendment challenge.

In any event, *Rahimi* supports the government's position that Section 922(g)(1) fits comfortably within the historical tradition of firearm regulation because it is "consistent with the principles that underpin our regulatory tradition." 2024 WL 3074728, at *6. Two historically derived principles independently and together support Section 922(g)(1)'s constitutionality, including in its application to Diaz.

First, historical tradition permits Congress to disarm individuals convicted of serious crimes. *See* Gov't Br. 25-30. This source of legislative authority flows from common law and founding-era capital punishment and estate forfeiture laws, laws disarming individuals convicted of non-capital crimes, and a "highly influential" Second Amendment precursor indicating a founding-era recognition of legislatures' authority to disarm persons "for crimes committed or real danger of public injury." *Id*. at 33 (emphasis and quotation marks omitted); *see also* Petition for Writ of Certiorari 13-16, *Garland v. Range*, No. 23-374 (filed Oct. 5, 2023).

Second, historical tradition allows Congress to disarm categories of individuals whose convictions indicate they would pose a danger to themselves or others if armed. This principle is derived from English common law, Second Amendment precursors, 19th-century sources, and a longstanding history of American legislatures disarming such persons—all without any indication that these regulations were perceived as incompatible with the right to keep and bear arms. *See* Petition, *Range*, *supra*, at 16-18 (collecting sources). Although *Rahimi* expressly reserved the question whether legislatures may "ban[] the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," 2024 WL 3074728, at *3, that principle is evident from the historical record.

"Taken together," these regulatory regimes are "relevantly similar" to Section 922(g)(1). *Rahimi*, 2024 WL 3074728, at *9. Section 922(g)(1)'s prohibition on firearm possession is comparable to, and is certainly not greater than, the burden imposed on those disarmed based on dangerousness or convicted of serious criminal conduct at the founding, who were often disarmed, deprived of all of their property, or condemned to death. *See* Gov't Br. 20-25. And these laws have a comparable justification: to prohibit firearm possession by individuals with convictions for serious criminal conduct or who Congress reasonably believes are likely to present a special danger of firearm misuse.

### III. *Rahimi* Undermines Diaz's Contrary Arguments.

In reaching a contrary conclusion, Diaz endorses the very methodological errors that *Rahimi* rejected.

A. Diaz adopts the *Rahimi* panel opinion's standard for assessing facial challenges. *See* Reply Br. 3-4; *see also* Diaz 28(j) Response (filed 6/4/2024) (explaining that "under *Bruen*, 'if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances'") (quoting *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023) (emphasis omitted)). But the Supreme Court squarely rejected that rule as an incorrect application of its precedents governing facial challenges. *Rahimi*, 2024 WL 3074728, at *6. The proper standard requires a defendant "to 'establish that no set of circumstances exists under which the Act would be valid.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "That means that to prevail, the Government need only demonstrate that [Section 922(g)(1)] is constitutional in some of its applications." *Id.*

The government maintains that Section 922(g)(1) is constitutional in all of its applications. At a minimum, Section 922(g)(1) is clearly constitutional in many of its applications, including as applied to Diaz. *Infra* p. 6. For example, courts have recognized that Section 922(g)(1) may be constitutionally applied to "people who have been convicted of a drive-by-shooting, carjacking, armed bank robbery, or even assassinating the President of the United States." *United States v. Canada*, 103 F.4th 257, 258-59 (4th Cir. 2024); *see also United States v. Gay*, 98 F.4th 843, 846-47 (7th Cir. 2024) (Section 922(g)(1) may be applied to someone who had "been convicted of 22 felonies, including aggravated battery of a peace officer and possessing a weapon while in prison"). Because "the government may constitutionally forbid people who have been found guilty of such acts from continuing to possess firearms," *Canada*, 103 F.4th at 259, Diaz's facial challenge necessarily fails.

B. Diaz also argues that the government must identify "distinctly similar" analogues to Section 922(g)(1), rather than only "relevantly similar" analogues, because the danger posed by felons has persisted since the founding. Diaz Br. 26-31; Reply Br. 7. But *Rahimi*, like *Bruen*, never mentions a separate "distinctly similar" test; it instead clarifies that in evaluating a Second Amendment challenge, courts assess whether the challenged law "is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 2024 WL 3074728, at *6; *see also id.* at *9. "[S]ome courts have misunderstood the methodology of [the Supreme Court's] recent Second Amendment cases" and have erroneously suggested that the Second Amendment permits only "those regulations identical to ones that could be found in 1791," *id.* at *6—an approach similar the one advanced in the *Rahimi* dissent. *See id.* at *35 (Thomas, J., dissenting).

In any event, though the existence of founding-era statutes that similarly disarmed all felons would be "a strong indicator" that Section 922(g)(1) "fall[s] within a permissible category of regulations," *id*. at *6, the absence of one does not spell doom for Section 922(g)(1). *Id*. at *9 (noting that although "Section 922(g)(8) is by no means identical" to surety and going armed laws, "it does not need to be"). Indeed, past lawmakers' failure to adopt a given regulation does not reflect doubts about its constitutionality. Rather, the idea of adopting such a regulation may have never occurred to the founders, who are not presumed to "maximally exercise[] their power to regulate." *Id*. at *30 (Barrett, J., concurring). Because Section 922(g)(1) is "consistent with" founding-era laws and practices restricting the firearm possession of felons and individuals whose firearm possession posed a heightened risk of danger, it passes constitutional muster. *Id*. at *6.

    C.    Diaz contends that capital punishment and estate forfeiture laws are not relevant because they were not firearm regulations and because they authorized different punishment than Section 922(g)(1). Reply Br. 10-14. *Rahimi* is instructive on both points.

First, *Rahimi* confirms that in assessing the Second Amendment's original meaning, courts are not confined to firearm regulations. Indeed, *Rahimi* relied on the historical surety tradition to sustain Section 922(8), even though that tradition was not limited to "target[ing] the misuse of firearms." 2024 WL 3074728, at *6-*8. *Rahimi*'s approach thus aligns with the Supreme Court's practice of consulting a "variety of legal and other sources" in assessing the Second Amendment's original meaning, *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008), including English history, *id*. at 598-600; analogous provisions in state constitutions, *id*. at 600-03; Second Amendment precursors, *id*. at 604-05; commentary, *id*. at 605-10, 616-19; case law, *id*. at 610-14; and legislative debates, *id*. at 614-16. *See also NYSRPA v. Bruen*, 597 U.S. 1, 20-21 (2022); *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024) (agreeing that "although traditional firearm regulations are an important source of historical evidence, they are not the only one").

Second, *Rahimi* expressly recognized that a historical precursor's use of different consequences to address a societal concern does not necessarily render it an inapt analogue. For example, *Rahimi* did not discount going armed laws because they authorized imprisonment, rather than disarmament, as punishment. 2024 WL 3074728, at *10. To the contrary, the Court acknowledged that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.* Similarly, if death and estate forfeiture were permissible consequences for individuals convicted of serious crimes, then the lesser restriction of disarmament is also permissible. *See Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (explaining that "it is difficult to conclude that the public,

in 1791, would have understood someone facing death … to be within the scope of those entitled to possess arms").

D. Diaz faults the government for "cobbl[ing] together … disparate restrictions … in an effort to manufacture a robust tradition of similar firearm regulation." Reply Br. 14-15. But the government's approach is precisely what *Rahimi* requires. Courts must assess whether the government's historical analogues establish a principle that is consistent with the Second Amendment when "[t]aken together." *Rahimi*, 2024 WL 3074728, at *9. The government's analogues do that here; Diaz's arguments, by contrast, mirror those in the *Rahimi* dissent. *See id.* at *45 (Thomas, J., dissenting) (criticizing the Court for "cobbl[ing] together" multiple historical laws rather than demanding a closer match to "a single historical law"). Diaz's contrary approach (*see* Reply Br. 15-21) of individually dissecting the government's historical analogues and dismissing them based on minute differences was squarely rejected in *Rahimi*. 2024 WL 3074728, at *10 (rejecting the dissent's argument that Section 922(g)(8) was not sufficiently similar to historical analogues); *see also Perez-Garcia*, 96 F.4th at 1191 (rejecting a "divide-and-conquer approach to the historical evidence").

**IV. Section 922(g)(1) Is Not Susceptible to As-Applied Challenges And Is, at the Very Least, Constitutional As Applied to Diaz.**

The government maintains that Section 922(g)(1) is constitutional in all of its applications and is not susceptible to as-applied challenges. *Rahimi* does not undermine the government's position on this point. Rather, the Court was careful to not "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 2024 WL 3074728, *9. And it again described prohibitions on firearm possession by felons as "presumptively lawful." *Id.* at *10. Consistent with the historical tradition discussed above, *see supra* p. 3, Congress may categorically disarm individuals convicted of felony offenses.

At a minimum, Section 922(g)(1) is constitutional as applied to Diaz, whose extensive criminal history includes felony convictions for vehicle theft, evading arrest, and possessing a firearm as a felon; who possessed firearms alongside distribution quantities of methamphetamine; and who committed this offense while on bond for a charge of making a terroristic threat after he threatened a woman with a gun. *See* Gov't Br. 40-44. Contrary to Diaz's claim, the government need not demonstrate "a historical tradition of disarming those convicted of the same crimes as" him. Reply Br. 23. That demanding standard would be to require a "historical twin" or "dead ringer" in direct contravention of *Rahimi* and *Bruen*. *See Rahimi*, 2024 WL 3074728, at *6.

This Court should affirm the district court's judgment.

Respectfully submitted,

| | |
|---|---|
| JAIME ESPARZA<br>United States Attorney | NICOLE M. ARGENTIERI<br>Principal Deputy Assistant Attorney General |
| ZACHARY RICHTER<br>Deputy Appellate Chief | LISA H. MILLER<br>Deputy Assistant Attorney General |
| LAUREN BRADLEY<br>Assistant United States Attorney<br>Western District of Texas | <u>/s/ Mahogane D. Reed</u><br>MAHOGANE D. REED<br>Attorney, Appellate Section<br>Criminal Division<br>U.S. Department of Justice<br>950 Pennsylvania Ave., N.W.<br>Washington, DC 20530<br>(202) 615-1170<br>mahogane.reed@usdoj.gov |

**CERTIFICATE OF COMPLIANCE**

1. This letter complies with the Court's June 21, 2024, order because it does not exceed six pages.

2. This letter complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced, 14-point serif typeface using Times New Roman.

*/s/ Mahogane D. Reed*
Mahogane D. Reed

**CERTIFICATE OF SERVICE**

I hereby certify that on June 28, 2024, I electronically filed the foregoing with the Clerk of the Court of the U.S. Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

*/s/ Mahogane D. Reed*
Mahogane D. Reed