# United States Court of Appeal for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
September 18, 2024
Lyle W. Cayce
Clerk

No. 23-50452

United States of America,

*Plaintiff—Appellee,*

versus

Ronnie Diaz, Jr.,

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CR-2-1

_____

Before Smith, Wiener, and Douglas, *Circuit Judges*.

Jacques L. Wiener, Jr., *Circuit Judge*:

  Defendant-Appellant Ronnie Diaz, Jr. was charged with, *inter alia*, possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). He moved to dismiss that charge, contending that the statute violates the Second Amendment, both facially and as applied to him. The district court denied that motion, and Diaz was convicted and sentenced. He appeals, again raising his Second Amendment argument and adding a Commerce Clause challenge, which he acknowledges is foreclosed by this court's precedent. For the reasons that follow, we AFFIRM.

No. 23-50452

I.

On November 4, 2020, officers from the San Antonio Police Department conducted a traffic stop of a car driven by Diaz. The officers noted a "strong odor of marijuana coming from the vehicle and empty baggies commonly known to contain narcotics." Diaz was asked to exit the vehicle and was placed in handcuffs. While his person was searched, he admitted that there was ammunition in his pocket and that he was a convicted felon. A search of the vehicle revealed a .45 caliber pistol, three baggies of methamphetamine, three baggies of counterfeit Xanax, and one small baggie of heroin.

This was not Diaz's first run-in with the law. After various misdemeanors, he was convicted in 2014 in Texas state court of theft of a vehicle and evading arrest or detention with a vehicle, and he was sentenced to three years' imprisonment. Then, in 2018, he was apprehended attempting to break into a car and found to be in possession of a handgun and a baggie containing methamphetamine. Diaz was convicted of possessing a firearm as a felon, again in state court, and was sentenced to two years' imprisonment.

After the November 2020 traffic stop, Diaz was charged in the Western District of Texas with the following: (1) count one, possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); (2) count two, possessing firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (3) count three, being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Diaz moved to dismiss count three of the indictment, arguing that 18 U.S.C. § 922(g)(1) is unconstitutional under *New York Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).

The district court denied that motion, and, after a bench trial, found Diaz guilty on all three counts. Diaz was sentenced to 120 months'

imprisonment on counts one and three, to run concurrently, and 60 months' imprisonment on count two, to run consecutively.

Diaz brings two claims on appeal. First, he asserts that his conviction under § 922(g)(1) is unconstitutional under the Second Amendment, both facially and as applied to him. Second, he contends that § 922(g)(1) exceeds Congress's power under the Commerce Clause. He acknowledges that this second argument is foreclosed under this court's precedent, and that he raises it only to preserve it for possible future review by the Supreme Court. *See United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013). We spend no more words on that subject.

We review constitutional challenges to a statute *de novo*. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

II.

The Second Amendment mandates that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. We begin by tracing the courts' application of this often-obfuscating language to statutes regulating firearm possession and use.

In 2001, this court evaluated the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits firearm possession by those subject to domestic violence restraining orders. *United States v. Emerson*, 270 F.3d 203, 212 (5th Cir. 2001). We determined that the statute does not violate the Second Amendment, which has always been limited in its application. *Id.* at 261. For example, "it is clear that felons, infants[,] and those of unsound mind may be prohibited from possessing firearms." *Id.* The necessary finding of a present and actual threat inherent in the issuance of a restraining order was a valid reason to restrict the Amendment's guarantee. *Id.* at 262.

No. 23-50452

Then, in 2003, we applied *Emerson* to § 922(g)(1) in *United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003). Section 922(g)(1) regulates possession of firearms by any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year." *Darrington* upheld the constitutionality of the statute by relying on *Emerson*'s language about "felons, infants[,] and those of unsound mind." *Id.* (quoting *Emerson*, 270 F.3d at 261). No additional analysis ensued.

The landscape of Second Amendment jurisprudence changed in 2008. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that a Washington D.C. law that prohibited possession of handguns in the home was unconstitutional. The Court interpreted the language of the Second Amendment and determined that its drafters intended for it to protect "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Thus, D.C.'s categorical prohibition did not pass constitutional muster. *Id.* at 628–29. However, Justice Scalia wrote, the right to bear arms is not unlimited: it is not a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. He cautioned that the opinion should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," among other limitations. *Id.* at 626–27. Those regulations, *Heller* said, are "presumptively lawful." *Id.* at 627 n.26.

After *Heller*, this court and its peers "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). We first considered "whether the challenged law impinges upon a right protected by the Second Amendment." *Id.* (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012)). If it did, we would then proceed to the second "means-end scrutiny" step, during which we determined "whether to apply intermediate or strict scrutiny," and then applied the

appropriate scrutiny to the challenged law. *Id.*; *see also Nat'l Rifle Ass'n*, 700 F.3d at 195. However, even after *Heller* and its resultant two-step framework, we continued to apply *Darrington* to bar challenges to § 922(g)(1) under the Second Amendment. *See, e.g.*, *United States v. Anderson*, 559 F.3d 348, 352 & n.6 (5th Cir. 2009) (explaining that *Heller* "provides no basis for reconsidering *Darrington*" because it re-affirmed longstanding prohibitions on felons' possessing firearms).

In 2022, the Supreme Court revisited and refined *Heller* in *Bruen*. There, the Court extended *Heller*'s protection for carrying handguns in the home to carrying them publicly. 597 U.S. at 8–9. In so doing, the Court rejected the second step of the two-step framework that had developed after *Heller*. *Id.* at 19 ("Despite the popularity of this two-step approach, it is one step too many."). "Step one," the Court wrote, "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* However, instead of moving on to means-ends scrutiny, the Court held that, when step one's requirements are met, the Constitution presumptively protects that conduct. *Id.* at 17. The burden then shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* This involves addressing "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Court held that the plain text of the Second Amendment protects the right to bear arms in public for self-defense, and that the government had failed to "identify an American tradition" justifying the regulation of such behavior. *Id.* at 38–39. The challenged New York law thus violated the Second Amendment.

A panel of this court applied *Bruen* to find § 922(g)(8) unconstitutional in *United States v. Rahimi*, 61 F.4th 443, 450–51 (5th Cir. 2023), *rev'd*, 144 S. Ct. 1889 (2024) (hereinafter "*Rahimi I*"). The panel considered various "historical analogues" and found that they were not "relevantly similar"

precursors to § 922(g)(8). *Id.* at 456. The Supreme Court reversed. 144 S.Ct. at 1903. An eight-Justice majority held that § 922(g)(8) "fits comfortably" in this Nation's tradition of "preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 1897. The Court first cited surety laws as a historical analogue. Those laws required individuals to post bonds whenever there was a "probable ground to suspect of future misbehaviour." *Id.* at 1899–1900 (quoting 4 Blackstone 251). Surety laws were used to "prevent all forms of violence, including spousal abuse" and the misuse of firearms. *Id.* at 1900. The Court also relied on "going armed" laws, which prohibited "riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* at 1901 (brackets omitted) (quoting 4 Blackstone 149). Because such conduct "disrupted the public order and led almost necessarily to actual violence . . . . the law punished these acts with forfeiture of the arms and imprisonment." *Id.* (cleaned up).

The Court examined "why and how" surety and going armed laws burdened the Second Amendment right to bear arms, as instructed by *Bruen*. *Id.* at 1898. It determined that, just like § 922(g)(8), both surety and going armed laws were used "to mitigate demonstrated threats of physical violence." *Id.* at 1901. In considering the "how," the Court found that § 922(g)(8)'s burden is comparable to the burdens imposed by surety and going armed laws. *Id.* None of these laws "broadly restrict arms use by the public generally," but instead apply only "once a court has found that the defendant 'represents a credible threat to the physical safety' of another." *Id.* at 1901–02 (quoting § 922(g)(8)(C)(i)). Surety laws were temporary restrictions, like § 922(g)(8), which applies only while a restraining order is in place. *Id.* at 1902. Finally, violating surety and going armed laws could result in imprisonment. *Id.* "[I]f imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also

permissible." *Id.* In short, the Court held that § 922(g)(8) does not violate the Second Amendment, facially or as applied to Rahimi, because "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.*

Having outlined the jurisprudence as it currently stands, we turn to Diaz's Second Amendment challenge.

### III.

Diaz brings a facial and an as-applied challenge to the constitutionality of 18 U.S.C. § 922(g)(1) under *Bruen*. We address the government's preliminary defenses before undertaking the historical analysis required by *Bruen* and its progeny to decide the merits of Diaz's claims.

### A.

The government first contends that our pre-*Bruen* precedent such as *Darrington*, which upheld the constitutionality of § 922(g)(1), is still the law of the land. It notes that *Bruen* did not address § 922(g)(1), nor any other "status-based gun restrictions." *See Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm."). We have repeatedly held that *Emerson* and *Darrington* foreclose Second Amendment challenges to § 922(g)(1). *See, e.g.*, *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017); *Anderson*, 559 F.3d at 352; *United States v. Mares*, 402 F.3d 511, 516 (5th Cir. 2005); *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004). But each of those cases predates *Bruen*, which established a new historical paradigm for analyzing Second Amendment claims. Under the rule of orderliness, a later panel may overturn another panel's decision when it has "fallen unequivocally out of step with some intervening change in the law." *In re Bonvillian Marine Servs., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021). *Bruen* constitutes such a change, "rendering our prior precedent obsolete." *Rahimi I*, 61 F.4th at 451.

No. 23-50452

The government maintains that these earlier cases survive *Bruen* because they were decided at *Heller*'s step one—historical tradition—and not at its second step which was repudiated by *Bruen*. *See Darrington*, 351 F.3d at 633–34; *Bruen*, 597 U.S. at 19. But *Darrington* relied solely on *Emerson* for its Second Amendment analysis, and *Emerson* was decided based on the means-ends scrutiny that *Bruen* renounced. *See Emerson*, 270 F.3d at 261; *Bruen*, 597 U.S. at 22–24.[1] The Supreme Court in *Rahimi* declined to even mention *Emerson*, which would have been directly on point to its consideration of § 922(g)(8). The law of orderliness mandates that we abandon that prior precedent.

Even if our own case law is no longer binding, says the government, the Supreme Court has already weighed in on the constitutionality of § 922(g)(1) as well. To be sure, there is language in the cases described above that contrasts the regulations at issue with the regulation of felons' possessing firearms. In *Heller*, the Court wrote that "nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626. Multiple concurrences in *Bruen* reiterated the Justices' intent to leave undisturbed those government regulations that prohibit convicted felons from carrying firearms. *See, e.g.*, 597 U.S. at 81 (Kavanaugh, J., concurring). Finally, *Rahimi* cited *Heller*'s language to again state that prohibitions on possession of firearms by "felons and the mentally ill" are "presumptively lawful." 144 S. Ct. at 1902. The

---

[1] *Rahimi I* specifically identified *Emerson* as "applying some form of means-ends scrutiny *sub silentio*." 61 F.4th at 450. Courts have recently (post-*Rahimi*-reversal) relied on this reasoning, distinguishing cases such as *Emerson* that involve means-ends scrutiny. *See United States v. Alvarez*, Crim. No. H-20-297, 2024 WL 3166935, at *3 (S.D. Tex. June 25, 2024); *see also United States v. Petteway*, No. 24 Cr. 80 (AT), 2024 WL 3105006, at *2 (S.D.N.Y. June 24, 2024) (adopting the same logic, distinguishing cases not involving means-ends scrutiny, under Second Circuit precedent).

government makes much of this language, suggesting that it can begin and end our analysis.

However, because none of those cases actually concerned § 922(g)(1), they are not binding precedent on the issue now before us. The Court did not complete any historical analysis of laws forbidding felons from possessing firearms, as required by *Bruen*. The mentions of felons in those cases are mere dicta. *See Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) ("A statement is dictum if it 'could have been deleted without seriously impairing the analytical foundations of the holding' and 'being peripheral, may not have received the full and careful consideration of the court that uttered it.'" (quoting *Gochicoa v. Johnson*, 238 F.3d 278, 286 n.11 (5th Cir. 2000)). And although we recognized in *McRorey v. Garland* that we are generally bound by Supreme Court dicta, 99 F.4th 831, 837 (5th Cir. 2024), that dicta cannot supplant the most recent analysis set forth by the Supreme Court in *Rahimi*, which we apply today. Without precedent that conducts *Bruen*'s historical inquiry into our Nation's tradition of regulating firearm possession by felons in particular, we must do so ourselves.[2]

The government also raises the familiar argument that Diaz is not among "the people" protected by the Second Amendment. We disagree. There are two approaches to take in considering the constitutionality of gun regulations. As now-Justice Barrett has written in an oft-cited passage, one

---

[2] Not all courts agree with this proposition. The Eleventh Circuit has recently relied solely upon *Rahimi*'s mention of *Heller*'s "felons and the mentally ill" language in upholding the constitutionality of § 922(g)(1). *See United States v. Rambo*, No. 23-13772, 2024 WL 3534730, at *2 (11th Cir. July 25, 2024) (per curiam); *United States v. Young*, No. 13-10464, 2024 WL 3466607, at *9 (11th Cir. July 19, 2024) (per curiam); *United States v. Johnson*, No. 23-11885, 2024 WL 3371414, at *3 (11th Cir. July 11, 2024) (per curiam). We respectfully disagree with this approach—especially after *Rahimi*—and believe that a full historical analysis is required.

approach "uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away." *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting). *Bruen* mandates the second approach. *See* 597 U.S. at 70 (explaining that the right can be limited under certain circumstances, but that the government does not require citizens to "demonstrate a special need for self-protection" to be entitled to the right in the first place). "[A]ll people have the right to keep and bear arms," but "history and tradition support Congress's power to strip certain groups of that right." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). The Court in *Rahimi* affirmed this approach, assuming that Rahimi was protected by the Second Amendment even though he had committed "family violence." *See* 144 S.Ct. at 1898. As Justice Thomas remarked in his dissent, it was "*undisputed* that the Second Amendment applies to Rahimi . . . . [It] extends to 'the people,' and that 'that term unambiguously refers to all members of the political community, not an unspecified subset.'" 144 S. Ct. at 1933 (Thomas, J., dissenting) (emphasis added) (quoting *Heller*, 554 U.S. at 580); *see also id.* at 1907 (Gorsuch, J., concurring) ("In this case, no one questions that the law Mr. Rahimi challenges addresses individual conduct covered by the text of the Second Amendment.").

Diaz's status as a felon is relevant to our analysis, but it becomes so in *Bruen*'s second step of whether regulating firearm use in this way is "consistent with the Nation's historical tradition" rather than in considering the Second Amendment's initial applicability. *See Bruen*, 597 U.S. at 24. As in *Rahimi*, the "two-step" view of *Bruen* is effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation. *See Rahimi*, 144 S. Ct. at 1898.

B.

Having disposed of the government's initial contentions, we reach the marrow of the case. We begin with Diaz's as-applied challenge, because it is "the narrower consideration." *See Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

The plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1), as it does with that of § 922(g)(8). *See Rahimi*, 144 S. Ct. at 1907 (Gorsuch, J., concurring). The burden thus shifts to the government to demonstrate that regulating Diaz's possession of a firearm is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. To satisfy this burden, the government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. Evidence must be "relevantly similar" to the challenged law. *Id.* at 29. In assessing similarity, we consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* The government identifies as relevant laws (1) focusing on how our Nation punished felons; and (2) disarming certain classes of persons.

For the purposes of assessing Diaz's predicate offenses under § 922(g)(1), we may consider prior convictions that are "punishable by imprisonment for a term exceeding one year." *See* § 922(g)(1). Diaz's pertinent criminal history consists of vehicle theft, evading arrest, and possessing a firearm as a felon. Both he and the government discuss various drug offenses in their briefing on his as-applied challenge, but those are not relevant for our purposes. In 2018 and 2020, Diaz was charged with possession of a controlled substance and possession with intent to deliver a controlled substance, but those charges were dismissed. He was convicted in state court of possession of less than two ounces of marijuana, but that is not a felony punishable by

more than one year, as required by § 922(g)(1). And count one of the conviction that Diaz appeals here (possession with intent to distribute) cannot serve as a predicate for his § 922(g)(1) charge in the same indictment; that charge must instead rely on previous history. Thus, the only relevant criminal convictions for our purposes are car theft, evading arrest, and possessing a firearm as a felon. To survive Diaz's as-applied challenge, the government must demonstrate that the Nation has a longstanding tradition of disarming someone with a criminal history analogous to this.

1. Punishment

The government first cites historical laws authorizing capital punishment and estate forfeiture as consequences for felonies. At the time of the Founding, the death penalty was "the standard penalty for all serious crimes." *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 23 (2002)); *see also Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death"). Colonies and states also routinely made use of estate forfeiture as punishment. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 CAL. L. REV. 277, 332 nn. 275 & 276 (2014) (collecting statutes). The government asserts that, since these penalties imposed such severe burdens on the right to bear arms, the lesser burden of disarmament via § 922(g)(1) is consistent with our Nation's history and traditions.

At the outset, Diaz contends that laws about capital punishment and estate forfeiture are not relevant because *Bruen* directs courts to consider whether the regulation is "consistent with the Nation's historical tradition of *firearm* regulation." *See Bruen*, 597 U.S. at 17 (emphasis added). Diaz notes that every historical law that *Bruen* addressed was an "explicit firearm regulation." That makes sense because *Bruen* was addressing the

constitutionality of a statute that entirely constrained carrying firearms outside of the home, applicable to everyone equally. Section 922(g)(1), in contrast, focuses on a specific group of people, so we may consider laws regulating that group, even if they are not explicitly related to firearms. In *Rahimi*, the Court did just that, considering several historical laws that were not explicitly related to guns, yet sometimes applied to limit their possession. *See* 144 S. Ct. at 1899. For example, surety laws targeted various kinds of "misbehaviour," just as did rules allowing capital punishment. *See id.* None of those laws were passed *solely* for the purpose of regulating firearm possession or use.

At the time of our Nation's birth, "felony" was "a term of loose signification." The Federalist No. 42, at 228 (James Madison); *see also* Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 465 (2009) (emphasizing the "ambiguity in the meaning of felony" at the Founding). The category was "a good deal narrower" then. *Lange v. California*, 594 U.S. 295, 311 (2021). "Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies." *Tennessee v. Garner*, 471 U.S. 1, 14 (1985). For example, possessing a firearm as a felon—one of Diaz's three predicate convictions justifying the application of § 922(g)(1)—was not considered a crime until 1938 at the earliest. *See* Federal Firearms Act, ch. 850, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938); An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87–342, § 2, 75 Stat. 757, 757 (1961). The fact that Diaz is a felon today, then, does not necessarily mean that he would have been one in the 18th century.

However, the government's evidence is more specifically targeted to Diaz's circumstances. It cites laws targeting the crime of theft, which was considered a felony at the time of the Founding and was punished accordingly. *See, e.g.*, 2 Records of the Court of Assistants of

No. 23-50452

the Colony of the Massachusetts Bay 1630–1692, at 32 (John Noble ed., 1904) (punishing theft by ordering, among other penalties, that "all his estate shalbe forfected"); Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664–65 (authorizing the death penalty for theft of chattels worth over five pounds). Our own research reveals that those convicted of horse theft—likely the closest colonial-era analogue to vehicle theft—were often subject to the death penalty. Kathryn Preyer, *Crime and Reform in Post-Revolutionary Virginia*, 1 Law & Hist. Rev. 53, 73 (1983). Those colonial-era laws correspond to the law against theft of a vehicle that serves as a predicate offense for Diaz's § 922(g)(1) charge. They establish that our country has a historical tradition of severely punishing people like Diaz who have been convicted of theft.

Addressing *Bruen*'s two "central considerations," the "why" of these examples aligns with the "why" of § 922(g)(1). As the government explains, these laws were "justified by the need to adequately punish felons, deter reoffending, and protect society from those proven untrustworthy to follow the law." The purpose of capital punishment in colonial America was threefold: deterrence, retribution, and penitence. *See* Banner, *supra*, at 23. Virginia, for example, punished the crime of horse theft with the death penalty for the purpose of deterring the crime. Robert M. Bohm, Death-Quest: An Introduction to the Theory and Practice of Capital Punishment 6 (1999). The precursor to § 922(g)(1), in turn, was enacted to "bar possession of a firearm from persons whose prior behaviors have established their violent tendencies." 114 Cong. Rec. 14773 (daily ed. May 23, 1968) (statement of Sen. Russell Long of Louisiana). It was intended to keep firearms out of the hands of those who are "a hazard to law-abiding citizens" and who had demonstrated that "they may not be trusted to possess a firearm without becoming a threat to society." *Id.* The

justification for § 922(g)(1) is relevantly similar to that of the offered examples: to deter violence and lawlessness.

As to the "how," these laws achieved their goals by permanently punishing offenders, as does § 922(g)(1). Capital punishment is obviously permanent, and the majority of the estate forfeiture laws that the government cites did not provide an opportunity for offenders to regain their possessions.[3] Permanent disarmament under § 922(g)(1) does not punish such crimes "to an extent beyond what was done at the founding," given the government's evidence that crimes such as theft were punished so severely and permanently. *See Rahimi*, 144 S. Ct. at 1898. The Court in *Rahimi* was persuaded that, "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that § 922(g)(8) imposes is also permissible." *Id.* at 1902. Here, if capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible. These laws establish a historical tradition of permanently punishing certain offenders who the evidence shows would have been considered felons and exposed to these types of penalties at the time of the Founding.

We emphasize that our holding is not only premised on the fact that Diaz is a felon. Simply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny. The legislature has determined that the term "felony" encompasses all crimes punishable by more than one year of imprisonment, rendering Diaz a felon today. But not all felons today would have been considered felons at the Founding. Further,

---

[3] There are some exceptions. *See* Colgan, *supra*, at 332 n.276 (citing a 1718 Pennsylvania law allowing a forfeited estate to be returned to a "criminal's wife and children"). But, combined with the capital punishment examples and the going armed laws described below, it is clear that America has a tradition of permanent punishment.

Congress may decide to change that definition in the future. Such a shifting benchmark should not define the limits of the Second Amendment, without further consideration of how that right was understood when it was first recognized. At that time, at least one of the predicate crimes that Diaz's § 922(g)(1) conviction relies on—theft—was a felony and thus would have led to capital punishment or estate forfeiture. Disarming Diaz fits within this tradition of serious and permanent punishment.[4]

2. Firearms

We could stop here, as the punishment-focused laws discussed above demonstrate a historical tradition of severely punishing people like Diaz who would have been felons at the Founding. At least one court, though, has expressed concern that just because "Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Range v. Attorney General*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc), *vacated in light of* Rahimi, 144 S. Ct. 4706 (2024). In that court's view, "[t]he greater does not necessarily include the lesser." *Id.* We thus consider the government's proffered firearm-focused evidence as well, to further illuminate the "how" of our country's tradition of punishment. *See Bruen*, 597 U.S. at 29.

The government first identifies as relevant two proposals from state constitutional conventions: a speech from a minority group in Pennsylvania and an amendment offered by Samuel Adams of Massachusetts. *Heller* discussed both of these sources. *See* 554 U.S. at 604 (calling the Pennsylvania proposal "highly influential"). The Pennsylvania address suggested that

---

[4] Our opinion today does not foreclose future as-applied challenges by defendants with different predicate convictions.

citizens have a personal right to bear arms "unless for crimes committed, or real danger of public injury." BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 662, 665 (1971). Massachusetts's proposed amendment said that the Constitution authorized "the people of the United States, who are peaceable citizens, [to keep] their own arms." *Id.* at 681. The government maintains that these contemporaneous examples support a national tradition of disarming those who are violent or pose a threat to public safety. However, relying solely on these types of unadopted proposals to establish a tradition is a "dubious" practice. *Heller*, 554 U.S. at 603. Nevertheless, taken together with the other evidence discussed herein, they do help to illuminate the "public understanding" of the Second Amendment around the time of its ratification. *See Bruen*, 597 U.S. at 20. They reveal that the right to bear arms at the time was not unlimited, and that the government could prevent people who had committed crimes or were "quarrelsome" from accessing weapons. *See* SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (5th Ed. 1773) (defining "unpeaceable").

The government also points to colonial-era statutes that prohibited going armed offensively and authorized forfeiture of weapons as punishment. *See, e.g.*, Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869); Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament 17 (1771); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794); A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99–100 (1836). These laws punished "those who had menaced others with firearms." *Rahimi*, 144 S. Ct. at 1900. Doing so "disrupted the 'public order' and 'le[d] almost necessarily to actual violence.'" *Id.* at 1901 (alteration in original) (quoting *State*

*v. Huntly*, 25 N.C. 418, 421–22 (1843) (per curiam)). *Rahimi* found these same going armed laws to be a relevant historical analogue to § 922(g)(8). *Id.*

The size of these laws' burden on the right to bear arms is comparable to that of § 922(g)(1). They both provide for permanent arms forfeiture as a penalty. *See, e.g.*, Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 53. Capital punishment and estate forfeiture were not the only severe penalties imposed on those who violated colonial-era laws. *Cf. Range*, 69 F.4th at 105. Imposing permanent disarmament as a punishment is also within our Nation's history and tradition. Applying § 922(g)(1) to Diaz "fits neatly" within that tradition. *See Rahimi*, 144 S. Ct. at 1901.[5]

Diaz complains that *Bruen* allows this type of reasoning-by-analogy only when the regulation in question was "unimaginable at the founding." *Bruen*, 597 U.S. at 28. He says that, because § 922(g)(1) does not address "unprecedented societal concerns or dramatic technological changes," only directly similar historical analogues should be considered. *Id.* at 27. This "bifurcated" approach has been rejected by the Supreme Court.[6] In *Bruen*, the Court noted that handgun possession for self-defense was a "straightforward historical inquiry," such that the historical analogues were "relatively simple to draw." 597 U.S. at 27. Even so, it compared the Second Amendment standard with the First and Sixth Amendments. *Id.* at 24–25. And, in *Rahimi*, the Court considered surety and going armed laws, despite the fact that

---

[5] We acknowledge that the justification behind going armed laws—to "mitigate demonstrated threats of physical violence"—does not necessarily support a tradition of disarming Diaz, whose underlying convictions do not inherently involve a threat of violence. *See* 144 S. Ct. at 1901. We focus on these laws to address the "how" of colonial-era firearm regulation, rather than the "why," which is supported by other evidence. *See Bruen*, 597 U.S. at 29.

[6] Justice Thomas, as the lone dissenting voice in *Rahimi*, advanced this interpretation. *See* 144 S. Ct. at 1933 (Thomas, J., dissenting).

domestic violence is not a new phenomenon. 144 S. Ct. at 1901; *see also id.* at 1904 (Sotomayor, J., concurring) ("[T]he Government has not identified a founding-era or Reconstruction-era law that specifically disarmed domestic abusers, but it did not need to do so." (citation omitted)). Going armed laws are relevant historical analogues to § 922(g)(1), just as *Rahimi* found them to be with respect to § 922(g)(8).

"Taken together," laws authorizing severe punishments for thievery and permanent disarmament in other cases establish that our tradition of firearm regulation supports the application of § 922(g)(1) to Diaz.[7] *See id.* Diaz's Second Amendment claim fails.

C.

Diaz also brings a facial challenge to § 922(g)(1). To sustain a facial challenge, "the challenger must establish that no set of circumstances exists under which the statute would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). This Diaz cannot do, because the statute is constitutional as applied to the facts of his own case. *See Rahimi*, 144 S. Ct. at 1898.

IV.

The government has met its burden to show that applying 18 U.S.C. § 922(g)(1) to Diaz is consistent with this Nation's historical tradition of firearm regulation. *See Bruen*, 597 U.S. at 17. At the time of the Second Amendment's ratification, those—like Diaz—guilty of certain crimes—like theft—were punished permanently and severely. And permanent disarmament was a part of our country's arsenal of available punishments at that time. Because

---

[7] Because the evidence discussed herein is sufficient to support a historical tradition of permanently disarming people like Diaz, we do not address the government's other historical examples.

No. 23-50452

applying § 922(g)(1) to Diaz "fits neatly" in this tradition, it is constitutional as applied and facially as well. *See Rahimi*, 144 S. Ct. at 1901.

    Diaz's conviction is AFFIRMED.