# No. 23-50452

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RONNIE DIAZ, JR.,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Texas, No. 5:21-cr-2

**PETITION FOR REHEARING EN BANC**

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
Tel.: (210) 472-6700
Fax: (210) 472-4454

CARL R. HENNIES
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

## UNITED STATES v. RONNIE DIAZ, JR., No. 23-50452

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Ronnie Diaz, Jr.,** Defendant-Appellant;

2. **Jaime Esparza,** U.S. Attorney;

3. **Ashley Hoff** and **Gregg Soffer,** former U.S. Attorneys;

4. **Tiffany Miller, Fidel Esparza III,** and **Mary Nelda Valadez,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

5. **Mahogane Denea Reed, Joseph H. Gay, Jr.,** and **Laura Tanner Bradley,** attorneys with the U.S. Department of Justice, who represent Plaintiff-Appellee in this Court.

6. **Maureen Scott Franco,** Federal Public Defender;

7. **Marina-Thais Douenat,** Assistant Federal Public Defender, who represented Defendant-Appellant in the district court; and

8. **Carl R. Hennies,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Carl R. Hennies
CARL R. HENNIES
*Attorney for Defendant-Appellant*

i

## INTRODUCTION AND RULE 35(b) STATEMENT

The federal felon-in-possession statute, 18 U.S.C. § 922(g)(1), categorically and permanently prohibits millions of Americans from exercising the fundamental right to keep and bear arms enshrined in the Second Amendment. To justify that severe restriction, the government must show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." *NYSRPA v. Bruen*, 597 U.S. 1, 24 (2022); *see also United States v. Rahimi*, 144 S. Ct. 1889 (2024). The government failed to do so here, and the panel's historical analysis conflicts with Supreme Court precedent, misstates the historical evidence, and misapplies *Bruen* and *Rahimi*.

In upholding § 922(g)(1), the panel primarily relied on a "historical tradition of severely punishing"—with capital punishment or estate forfeiture—"people like Diaz who have been convicted of theft." App. 14. But this reasoning conflicts with Supreme Court precedent. *First*, the Supreme Court requires courts to compare a modern regulation to our tradition of *firearm* regulation. But capital punishment and estate forfeiture are not *firearm* regulations. *Second*, the Supreme Court has instructed courts not to treat the Second Amendment as a second-class right, but the panel's decision does just that. Individuals do not permanently lose other fundamental rights—like freedom of speech or the right to be free

from unreasonable searches and seizures—simply because they committed an offense that may have been punished by death in early America. *Third*, the Supreme Court has expressed doubt that three laws can establish a historical tradition. The panel, however, relied on only three laws to divine a tradition of severe punishment for some offenses. Even aside from these conflicts with binding precedent, the panel misstated the limited historical evidence it cited: a founding-era New York law did *not* include theft among crimes punishable by death, horse theft was *rarely* punished by death in post-revolutionary Virginia, and no estate forfeiture law (including in colonial Massachusetts) imposed a *permanent* ban on gun possession.

In addition to severe punishment, the panel also cited rejected state constitutional proposals and going armed laws to support § 922(g)(1). These historical analogues fare no better. Relying on the rejected state proposals is in significant tension with precedent from both the Supreme Court and this Court. And going armed laws are drastically different from § 922(g)(1) in how and why they burden the right to bear arms.

Applying the correct historical analysis, § 922(g)(1) facially violates the Second Amendment. The statute's lifetime ban on firearm possession imposes a historically unprecedented burden on the right to bear arms for self-defense that would have been

unimaginable to our Founders. At the very least, § 922(g)(1) is unconstitutional as applied to individuals like Diaz with convictions for only non-violent offenses.

This case warrants en banc review both because it presents a question of exceptional importance involving a fundamental constitutional right and because the panel's decision conflicts with Supreme Court precedent. *See* Fed. R. App. P. 35(b)(1)(A), (B).

# TABLE OF CONTENTS

Introduction and Rule 35(b) statement ............................................ ii

Table of authorities ........................................................ vi

Issue warranting en banc review .................................... 1

Statement of the case ...................................................... 1

Argument ........................................................................ 3

I.  The panel's historical analysis conflicts with Supreme
    Court precedent, misstates the historical record, and
    misapplies *Bruen* and *Rahimi*. .................................................. 4

    A.  The panel's reliance on capital punishment and estate
        forfeiture cannot justify § 922(g)(1). ................................... 5

    B.  None of the "firearm-focused" analogues the panel
        cited justify § 922(g)(1). ...................................................11

II. Applying the correct historical analysis, § 922(g)(1) violates
    the Second Amendment facially and as applied to Diaz........... 15

    A.  Section 922(g)(1) is facially unconstitutional because
        its burden—lifetime disarmament—is historically
        unprecedented. .................................................. 15

    B.  At the very least, § 922(g)(1) is unconstitutional as
        applied to Diaz because there is no tradition of
        disarming non-violent individuals. .................................. 16

Conclusion.................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Cent. Pines Land Co. v. United States,*
    274 F.3d 881 (5th Cir. 2001) ....................................................... 13

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .................................................................... 12

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) .................................................. 8, 10

*NYSRPA v. Bruen,*
    597 U.S. 1 (2022) ................................................................*passim*

*Range v. Att'y Gen.,*
    69 F.4th 96 (3d Cir. 2023) ......................................................... 11

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024) .........................................................*passim*

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir. 2023) ...................................................... 12

*United States v. Williams,*
    113 F.4th 637 (6th Cir. 2024) ...................................................... 8

**Constitutional Provisions**

U.S. Const. amend. II ...................................................................... 3

**Statutes**

18 U.S.C. § 922(g)(1) .............................................................*passim*

18 U.S.C. § 922(g)(8) ....................................................................... 7

## Rules

Fed. R. App. P. 35(b)(1)(A) .................................................................. iv

Fed. R. App. P. 35(b)(1)(B) ................................................................ iv

## Other Authorities

2 RECORDS OF THE COURT OF ASSISTANTS OF THE COLONY OF THE
    MASSACHUSETTS BAY 1630–1632 (John Noble ed., 1904) ............ 11

Acts and Resolves, Public and Private, of the
    Province of the Massachusetts Bay 53 ...................................... 14

Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664–65 ..................... 10

Gov't Br.,
    *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023) ......... 13

Kathryn Preyer,
    *Crime and Reform in Post-Revolutionary Virginia*,
    1 Law & Hist. Rev. 53 (1983) ......................................................... 9

**ISSUE WARRANTING EN BANC REVIEW**

Whether 18 U.S.C. § 922(g)(1), which prohibits the possession of firearms by a person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year," violates the Second Amendment facially or as applied to individuals with convictions for only non-violent offenses.

**STATEMENT OF THE CASE**

**1.** In late 2020, officers with the San Antonio Police Department pulled Diaz over for a traffic violation. ROA.499. During the stop, officers found a firearm in his car. ROA.499. Diaz had three earlier convictions in Texas state court—each punishable by more than a year in prison—for non-violent offenses. In 2014, he was convicted of vehicle theft and evading arrest with a vehicle. ROA.502–03. And in 2018, he was convicted of possessing a firearm as a felon. ROA.503–04.

**2.** An indictment charged Diaz with three counts, including being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). ROA.17–19. Diaz moved to dismiss the felon-in-possession count. ROA.143–56. He argued that § 922(g)(1) facially violates the Second Amendment under the two-step framework set

out by the Supreme Court in *Bruen*. ROA.143–56. In the alternative, Diaz argued that § 922(g)(1) is unconstitutional as applied to him because his prior convictions were for non-violent offenses. ROA.154–55. The district court denied the motion to dismiss. ROA.221–31. Diaz proceeded to a stipulated bench trial, ROA.447–79, and the district court found him guilty of violating § 922(g)(1), ROA.275–76.

**3.** A panel of this Court affirmed. At the outset, the panel held that the Court's earlier precedent upholding § 922(g)(1) was "obsolete" because *Bruen* "established a new historical paradigm for analyzing Second Amendment claims." App. 7. The panel also held that the "plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)" and that Diaz is among "the people" protected by the Second Amendment. App. 9–11.

The panel, however, held that the country's tradition of firearm regulation supports applying § 922(g)(1) to Diaz. App. 12–19. The panel identified a "historical tradition of severely punishing people like Diaz who have been convicted of theft." App. 12–16. The panel held that because individuals convicted of theft were subject to capital punishment or estate forfeiture in the founding era, they could face the "lesser restriction" of complete disarmament now.

App. 15. The panel noted, however, that its opinion did "not foreclose future as-applied challenges by defendants with different predicate convictions." App. 16 n.4. The panel also cited two proposals from state constitutional conventions and going armed laws from several states. App. 16–19. The panel concluded that, "[t]aken together, laws authorizing severe punishments for thievery and permanent disarmament in other cases establish that our tradition of firearm regulation supports the application of § 922(g)(1) to Diaz." App. 19. And because the panel held that the statute was constitutional as applied to Diaz, it rejected his facial challenge. App. 19.

## ARGUMENT

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In *NYSRPA v. Bruen*, 597 U.S. 1 (2022), the Supreme Court announced a two-step framework for analyzing Second Amendment challenges. And in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court applied that framework to a criminal law restricting firearm possession.

At step one, courts must ask whether the "Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. At

the second step, the government must show that a modern gun regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id*. This analogical inquiry does not require a "historical twin," but it also is not a "regulatory blank check." *Id*. at 30. The central considerations when engaging in this analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. at 29. In other words, courts must consider "how and why" the regulations burden the right to bear arms. *Id*.

The panel correctly held, at the first step, that "the plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." App. 11. But the panel's historical analysis at step two—and its resulting conclusion that § 922(g)(1) is constitutional facially and as applied to Diaz—is flawed in several respects. The Court should grant en banc review to correct those errors.

## I. The panel's historical analysis conflicts with Supreme Court precedent, misstates the historical record, and misapplies *Bruen* and *Rahimi*.

The panel's historical analysis concluded that two historical traditions support § 922(g)(1): (1) "severely punishing" certain

felons, and (2) a "firearm-focused" tradition of disarmament evidenced by state constitutional proposals and going armed laws. App. 12–19. But these traditions—even "[t]aken together," App. 19—fail to justify § 922(g)(1).

## A. The panel's reliance on capital punishment and estate forfeiture cannot justify § 922(g)(1).

The panel primarily relied on capital punishment and estate forfeiture as historical analogues supporting § 922(g)(1). App. 12–16. But the panel's reliance on these forms of punishment conflicts with Supreme Court precedent and misstates the historical record.

**1.** The panel's reliance on capital punishment and estate forfeiture conflicts with Supreme Court precedent in three ways.

**a.** Supreme Court precedent requires the government to show that a modern gun law aligns with our "historical tradition of *firearm* regulation." *Bruen*, 597 U.S. at 24 (emphasis added); *Rahimi*, 144 S. Ct. at 1897 (same). In other words, the government's historical analogues must regulate *firearms*. Indeed, *Rahimi* relied only on historical laws that "specifically addressed firearms violence." 144 S. Ct. at 1899. So did *Bruen*. *See* 597 U.S. at 38–66.

Capital punishment and estate forfeiture, however, are not *firearm* regulations. Neither the government (*see* Gov't Br. 26–30)

5

nor the panel (*see* App. 12–16) asserts otherwise. So these punishments cannot justify § 922(g)(1). In relying on capital punishment and estate forfeiture as historical analogues, the panel misinterpreted the Supreme Court's decision in *Rahimi* in two ways.

*First*, the panel asserted that *Rahimi* "considered several laws that were not explicitly related to guns." App. 13. But *Rahimi* says just the opposite. In *Rahimi*, the Supreme Court relied on two historical legal regimes—surety laws and going armed laws—that "*specifically addressed firearms violence.*" 144 S. Ct. at 1899 (emphasis added). To be sure, surety laws were not "passed *solely* for the purpose of regulating firearm possession or use." App. 13. But the Supreme Court emphasized that, "*[i]mportantly for this case*, the surety laws also targeted the misuse of firearms." *Rahimi*, 144 S. Ct. at 1900 (emphasis added). In other words, laws that did *not* target the misuse of firearms—like capital punishment and estate forfeiture—are *not* proper analogues.

*Second*, the panel noted that the Supreme Court accepted a "greater-includes-the-lesser" argument in *Rahimi*. App. 15. That is true as far as it goes. *Rahimi* held that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary

disarmament … is also permissible." 144 S. Ct. at 1891. But it does not follow, as the panel concluded, that "if capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." App. 15. *Rahimi* explained that the purpose of imprisonment under the going armed laws was "to respond to the use of guns to threaten the physical safety of others." 144 S. Ct. at 1891. So both the greater restriction (imprisonment under the going armed laws) and the lesser punishment (disarmament under 18 U.S.C. § 922(g)(8)) had the same purpose. Not so here. Again, capital punishment simply did not target gun violence.

Because neither capital punishment nor estate forfeiture establish a tradition of *firearm* regulation, Supreme Court precedent forecloses employing them as historical analogues for § 922(g)(1).

**b.** The Supreme Court has also emphasized that the right to bear arms "is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (cleaned up). But the panel's reasoning—that because capital punishment is an "obviously permanent" deprivation of an individual's right to bear arms, the lesser restriction of permanent disarmament is permissible for individuals who are not executed,

App. 15—conflicts with how the Constitution treats other fundamental rights.

"Felons, after all, don't lose other rights guaranteed in the Bill of Rights even though an offender who committed the same act in 1790 would have faced capital punishment." *United States v. Williams*, 113 F.4th 637, 658 (6th Cir. 2024). "No one suggests that such an individual has no right to a jury trial or be free from unreasonable searches and seizures." *Id.* And as now-Justice Barrett recognized, "we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding." *Kanter v. Barr*, 919 F.3d 437, 461–62 (7th Cir. 2019) (Barrett, J., dissenting). "The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society." *Id.* at 462. Rather, "history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class." *Id.* at 461.

So by tying the loss of the right to bear arms to capital punishment, the panel—contrary to Supreme Court precedent—rendered

the Second Amendment a second-class right subject to different rules than other fundamental rights.

**c.** Finally, the Supreme Court has expressed "doubt that *three* colonial regulations could suffice to show a tradition." *Bruen*, 597 U.S. at 46. But the panel relied on only three laws to establish a tradition of severely punishing individuals who have been convicted of theft: a colonial Massachusetts law, a founding-era New York law, and a post-revolutionary Virginia law. App. 14. Putting to one side whether the panel's reading of these laws is correct (*see infra* 9–11), Supreme Court precedent establishes that this limited historical evidence is simply too slender a reed to establish a tradition justifying the deprivation of a fundamental constitutional right.

**2.** Besides conflicting with Supreme Court precedent, the panel's decision misstated the historical evidence it relied on.

**a.** The panel stated that "those convicted of horse theft—likely the closest colonial-era analogue to vehicle theft—were *often* subject to the death penalty." App. 14 (emphasis added). But the only source the panel cites for that proposition explains that "hardly any horse thieves were executed." *See* Kathryn Preyer, *Crime and Reform in Post-Revolutionary Virginia*, 1 Law & Hist. Rev. 53, 73 (1983). And

the fact that a few Virginia horse thieves were executed says nothing about the gun rights of those who were not.

**b.** Next, the panel stated that a founding-era New York law "authoriz[ed] the death penalty for theft of chattels worth over five pounds." App. 14. But that is not so. The statute does not authorize the death penalty for theft (at least for a first offense). *See* Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664–65. The only property crimes subject to capital punishment were different varieties of burglary and robbery; "feloniously taking any goods or chattles out of any church or place of public worship"; and "feloniously taking away any goods or chattels being in any dwelling house, the owner or any other person being therein and put in fear." *Id.*[1] Because this New York statute does not authorize the death penalty for theft, it cannot support the weight the panel placed on it. Indeed, "property crimes including variations on theft, burglary, and robbery were, on the whole, not capital" at the founding. *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) (citation omitted).

---

[1] Under the statute, "any felony" not enumerated was punishable by imprisonment, a fine, or corporal punishment. *See* Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664–65. These unlisted felonies were punishable by death only if it was a "second offence" or "committed after such first conviction." *Id.*

**c.** The panel characterized estate forfeiture as a type of "permanent" disarmament. App. 15. But nothing in the historical record the government compiled—including the Massachusetts decision the panel cited—suggests that, once a person's estate was forfeited, he or she could not obtain other firearms in the future. *See, e.g.*, 2 RECORDS OF THE COURT OF ASSISTANTS OF THE COLONY OF THE MASSACHUSETTS BAY 1630–1632, at 32 (John Noble ed., 1904). Indeed, "[f]orfeiture still allows a person to keep their other firearms or obtain additional ones." *Rahimi*, 144 S. Ct. at 1937 (Thomas, J., dissenting). And a founding-era felon "could repurchase arms after successfully completing his sentence and reintegrating into society." *Range v. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc), *judgment vacated*, 144 S. Ct. 2706 (2024).

## B. None of the "firearm-focused" analogues the panel cited justify § 922(g)(1).

The panel explained that it "could stop" its historical analysis with the laws focused on severe punishment. App. 16. But the panel went further, considering the government's "firearm-focused evidence" and determining that rejected state constitutional proposals and going armed laws also support § 922(g)(1). App. 16–

19. The panel misplaced reliance on both the state proposals and going armed laws. Neither support § 922(g)(1).

**1.** The panel's reliance on state constitutional proposals from Pennsylvania and Massachusetts (App. 16–17) is in significant tension with precedent from both the Supreme Court and this Court. As the panel acknowledged, the Supreme Court has cautioned that relying on these unadopted proposals to interpret the Second Amendment is "dubious." App. 17 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 603 (2008)). That should have been the end of the matter.

Still, the panel determined that these rejected proposals "help to illuminate the public understanding of the Second Amendment around the time of its ratification." App. 17 (cleaned up). But that departs from this Court's recognition that "these proposed amendments are not reflective of the Nation's early understanding of the scope of the Second Amendment right." *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023), *rev'd on other grounds*, 144

S. Ct. 1889 (2024).[2]  And that makes sense. These proposals "carry little interpretive weight" because "the States rejected the proposals." *Rahimi*, 144 S. Ct. at 1936 (Thomas, J., dissenting). If anything, these "unsuccessful proposals suggest that the Second Amendment preserves a more expansive right" because they show that "the Founders considered, and rejected, any textual limitations in favor of an unqualified directive." *Id.* So these rejected state proposals provide no support for § 922(g)(1).

**2.**  The panel's citation to going armed laws (App. 17–18) is even further afield. Those laws differ dramatically from § 922(g)(1) in how and why they burden the right to bear arms. The panel acknowledged that the "justification" behind these laws—the *why*—is different from § 922(g)(1). App. 18 n.5. Going armed laws punished "those who had menaced others with firearms." *Rahimi*, 144 S. Ct.

---

[2] Although the Supreme Court reversed this Court's *Rahimi* decision on other grounds, this Court's holding that these state proposals do not reflect our Nation's understanding of the Second Amendment remains binding authority. *See*, *e.g.*, *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 & n.57 (5th Cir. 2001). If anything, the Supreme Court's decision supports this Court's rejection of the proposals. The government argued in the Supreme Court that these state proposals "shed light on the [Second] Amendment's meaning." *See* Gov't Br. 17–18, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023). But the Supreme Court never mentioned them. *See generally Rahimi*, 144 S. Ct. 1889.

at 1900. In other words, they criminalized specific—and serious—misconduct with a gun. Section 922(g)(1), on the other hand, prohibits mere possession whether or not someone is using a gun to menace others.

But *how* these laws burden the right to bear arms is also a far cry from § 922(g)(1). *First*, going armed laws required a judicial determination that "a particular defendant … had threatened another with a weapon." *Rahimi*, 144 S. Ct. at 1902. Section 922(g)(1), by contrast, bans a category of people from possessing firearms with no such individualized determination. *Second*, going armed laws did not impose a *permanent* ban on firearm possession like § 922(g)(1) does. The panel's suggestion that going armed laws provided for "permanent arms forfeiture" (App. 18) is unsupported by the historical record. For example, the only statute the panel cites simply provides that a justice of the peace may "take away" the "armour or weapons" used during the offense. *See* Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 53. As with estate forfeiture, nothing suggests that this forfeiture provision applied prospectively to prohibit individuals convicted of going armed from ever obtaining firearms in the future. *See supra* 11.

## II. Applying the correct historical analysis, § 922(g)(1) violates the Second Amendment facially and as applied to Diaz.

With these errors in the panel's historical analysis corrected, it is clear that § 922(g)(1) violates the Second Amendment facially or—at the very least—as applied to Diaz. The statute does not align with our Nation's tradition of firearm regulation in either of the two central considerations: *how* and *why* it burdens the right to keep and bear arms. *See Bruen*, 597 U.S. at 29; *Rahimi*, 144 S. Ct. at 1898. The difference in *how* § 922(g)(1) burdens the right to bear arms is fatal to the statute facially, and *why* it burdens the right to bear arms dooms the statute as applied.

### A. Section 922(g)(1) is facially unconstitutional because its burden—lifetime disarmament—is historically unprecedented.

Section 922(g)(1) facially violates the Second Amendment because it imposes a historically unprecedented lifetime ban on possessing firearms. The government has not cited *any* historical firearm regulation imposing a permanent, no-exception prohibition on the right to keep arms for self-defense—no matter how egregious an individual's conduct. In other words, no historical regulation "impose[s] a comparable burden on the right of armed self-defense." *See Bruen*, 597 U.S. at 29. Thus, § 922(g)(1) facially violates the

Second Amendment because there are "no set of circumstances" under which it is valid. *See Rahimi*, 144 S. Ct. at 1898.

**B.** **At the very least, § 922(g)(1) is unconstitutional as applied to Diaz because there is no tradition of disarming non-violent individuals.**

Section 922(g)(1) bans even individuals convicted of non-violent offenses from possessing firearms for self-defense. And the panel acknowledged that Diaz's prior convictions do not "involve a threat of violence." App. 18 n.5. But the government has cited *no* tradition of disarming non-violent individuals. At most, the government's historical evidence shows a tradition of disarming violent individuals threatening armed insurrection or actively misusing firearms. *See* Gov't Br. 30–33. And "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Rahimi*, 144 S. Ct. at 1902. Because the government has failed to point to any evidence disarming individuals convicted of similar non-violent offenses as Diaz, § 922(g)(1) at the very least violates the Second Amendment as applied to him.

## CONCLUSION

The Court should grant rehearing en banc.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Carl R. Hennies
CARL R. HENNIES
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 35(b)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,746 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Carl R. Hennies
CARL R. HENNIES
*Attorney for Defendant-Appellant*

Dated: October 8, 2024

# APPENDIX

*United States v. Diaz*, No. 23-50452 (Sept. 18, 2024)

# United States Court of Appeal
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 18, 2024

Lyle W. Cayce
Clerk

--------

No. 23-50452

--------

United States of America,

*Plaintiff—Appellee,*

*versus*

Ronnie Diaz, Jr.,

*Defendant—Appellant.*

--------

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CR-2-1

--------

Before Smith, Wiener, and Douglas, *Circuit Judges.*

Jacques L. Wiener, Jr., *Circuit Judge*:

Defendant-Appellant Ronnie Diaz, Jr. was charged with, *inter alia*, possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). He moved to dismiss that charge, contending that the statute violates the Second Amendment, both facially and as applied to him. The district court denied that motion, and Diaz was convicted and sentenced. He appeals, again raising his Second Amendment argument and adding a Commerce Clause challenge, which he acknowledges is foreclosed by this court's precedent. For the reasons that follow, we AFFIRM.

No. 23-50452

### I.

On November 4, 2020, officers from the San Antonio Police Department conducted a traffic stop of a car driven by Diaz. The officers noted a "strong odor of marijuana coming from the vehicle and empty baggies commonly known to contain narcotics." Diaz was asked to exit the vehicle and was placed in handcuffs. While his person was searched, he admitted that there was ammunition in his pocket and that he was a convicted felon. A search of the vehicle revealed a .45 caliber pistol, three baggies of methamphetamine, three baggies of counterfeit Xanax, and one small baggie of heroin.

This was not Diaz's first run-in with the law. After various misdemeanors, he was convicted in 2014 in Texas state court of theft of a vehicle and evading arrest or detention with a vehicle, and he was sentenced to three years' imprisonment. Then, in 2018, he was apprehended attempting to break into a car and found to be in possession of a handgun and a baggie containing methamphetamine. Diaz was convicted of possessing a firearm as a felon, again in state court, and was sentenced to two years' imprisonment.

After the November 2020 traffic stop, Diaz was charged in the Western District of Texas with the following: (1) count one, possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); (2) count two, possessing firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (3) count three, being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Diaz moved to dismiss count three of the indictment, arguing that 18 U.S.C. § 922(g)(1) is unconstitutional under *New York Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).

The district court denied that motion, and, after a bench trial, found Diaz guilty on all three counts. Diaz was sentenced to 120 months'

No. 23-50452

imprisonment on counts one and three, to run concurrently, and 60 months' imprisonment on count two, to run consecutively.

Diaz brings two claims on appeal. First, he asserts that his conviction under § 922(g)(1) is unconstitutional under the Second Amendment, both facially and as applied to him. Second, he contends that § 922(g)(1) exceeds Congress's power under the Commerce Clause. He acknowledges that this second argument is foreclosed under this court's precedent, and that he raises it only to preserve it for possible future review by the Supreme Court. *See United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013). We spend no more words on that subject.

We review constitutional challenges to a statute *de novo*. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

## II.

The Second Amendment mandates that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. We begin by tracing the courts' application of this often-obfuscating language to statutes regulating firearm possession and use.

In 2001, this court evaluated the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits firearm possession by those subject to domestic violence restraining orders. *United States v. Emerson*, 270 F.3d 203, 212 (5th Cir. 2001). We determined that the statute does not violate the Second Amendment, which has always been limited in its application. *Id.* at 261. For example, "it is clear that felons, infants[,] and those of unsound mind may be prohibited from possessing firearms." *Id.* The necessary finding of a present and actual threat inherent in the issuance of a restraining order was a valid reason to restrict the Amendment's guarantee. *Id.* at 262.

No. 23-50452

Then, in 2003, we applied *Emerson* to § 922(g)(1) in *United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003). Section 922(g)(1) regulates possession of firearms by any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year." *Darrington* upheld the constitutionality of the statute by relying on *Emerson*'s language about "felons, infants[,] and those of unsound mind." *Id.* (quoting *Emerson*, 270 F.3d at 261). No additional analysis ensued.

The landscape of Second Amendment jurisprudence changed in 2008. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that a Washington D.C. law that prohibited possession of handguns in the home was unconstitutional. The Court interpreted the language of the Second Amendment and determined that its drafters intended for it to protect "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Thus, D.C.'s categorical prohibition did not pass constitutional muster. *Id.* at 628–29. However, Justice Scalia wrote, the right to bear arms is not unlimited: it is not a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. He cautioned that the opinion should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," among other limitations. *Id.* at 626–27. Those regulations, *Heller* said, are "presumptively lawful." *Id.* at 627 n.26.

After *Heller*, this court and its peers "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). We first considered "whether the challenged law impinges upon a right protected by the Second Amendment." *Id.* (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012)). If it did, we would then proceed to the second "means-end scrutiny" step, during which we determined "whether to apply intermediate or strict scrutiny," and then applied the

appropriate scrutiny to the challenged law. *Id.*; *see also Nat'l Rifle Ass'n*, 700 F.3d at 195. However, even after *Heller* and its resultant two-step framework, we continued to apply *Darrington* to bar challenges to § 922(g)(1) under the Second Amendment. *See, e.g.*, *United States v. Anderson*, 559 F.3d 348, 352 & n.6 (5th Cir. 2009) (explaining that *Heller* "provides no basis for reconsidering *Darrington*" because it re-affirmed longstanding prohibitions on felons' possessing firearms).

In 2022, the Supreme Court revisited and refined *Heller* in *Bruen*. There, the Court extended *Heller*'s protection for carrying handguns in the home to carrying them publicly. 597 U.S. at 8–9. In so doing, the Court rejected the second step of the two-step framework that had developed after *Heller*. *Id.* at 19 ("Despite the popularity of this two-step approach, it is one step too many."). "Step one," the Court wrote, "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* However, instead of moving on to means-ends scrutiny, the Court held that, when step one's requirements are met, the Constitution presumptively protects that conduct. *Id.* at 17. The burden then shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* This involves addressing "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Court held that the plain text of the Second Amendment protects the right to bear arms in public for self-defense, and that the government had failed to "identify an American tradition" justifying the regulation of such behavior. *Id.* at 38–39. The challenged New York law thus violated the Second Amendment.

A panel of this court applied *Bruen* to find § 922(g)(8) unconstitutional in *United States v. Rahimi*, 61 F.4th 443, 450–51 (5th Cir. 2023), *rev'd*, 144 S. Ct. 1889 (2024) (hereinafter "*Rahimi I*"). The panel considered various "historical analogues" and found that they were not "relevantly similar"

precursors to § 922(g)(8). *Id.* at 456. The Supreme Court reversed. 144 S.Ct. at 1903. An eight-Justice majority held that § 922(g)(8) "fits comfortably" in this Nation's tradition of "preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 1897. The Court first cited surety laws as a historical analogue. Those laws required individuals to post bonds whenever there was a "probable ground to suspect of future misbehaviour." *Id.* at 1899–1900 (quoting 4 Blackstone 251). Surety laws were used to "prevent all forms of violence, including spousal abuse" and the misuse of firearms. *Id.* at 1900. The Court also relied on "going armed" laws, which prohibited "riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* at 1901 (brackets omitted) (quoting 4 Blackstone 149). Because such conduct "disrupted the public order and led almost necessarily to actual violence . . . . the law punished these acts with forfeiture of the arms and imprisonment." *Id.* (cleaned up).

The Court examined "why and how" surety and going armed laws burdened the Second Amendment right to bear arms, as instructed by *Bruen*. *Id.* at 1898. It determined that, just like § 922(g)(8), both surety and going armed laws were used "to mitigate demonstrated threats of physical violence." *Id.* at 1901. In considering the "how," the Court found that § 922(g)(8)'s burden is comparable to the burdens imposed by surety and going armed laws. *Id.* None of these laws "broadly restrict arms use by the public generally," but instead apply only "once a court has found that the defendant 'represents a credible threat to the physical safety' of another." *Id.* at 1901–02 (quoting § 922(g)(8)(C)(i)). Surety laws were temporary restrictions, like § 922(g)(8), which applies only while a restraining order is in place. *Id.* at 1902. Finally, violating surety and going armed laws could result in imprisonment. *Id.* "[I]f imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also

No. 23-50452

permissible." *Id.* In short, the Court held that § 922(g)(8) does not violate the Second Amendment, facially or as applied to Rahimi, because "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.*

Having outlined the jurisprudence as it currently stands, we turn to Diaz's Second Amendment challenge.

## III.

Diaz brings a facial and an as-applied challenge to the constitutionality of 18 U.S.C. § 922(g)(1) under *Bruen*. We address the government's preliminary defenses before undertaking the historical analysis required by *Bruen* and its progeny to decide the merits of Diaz's claims.

## A.

The government first contends that our pre-*Bruen* precedent such as *Darrington*, which upheld the constitutionality of § 922(g)(1), is still the law of the land. It notes that *Bruen* did not address § 922(g)(1), nor any other "status-based gun restrictions." *See Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm."). We have repeatedly held that *Emerson* and *Darrington* foreclose Second Amendment challenges to § 922(g)(1). *See, e.g.*, *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017); *Anderson*, 559 F.3d at 352; *United States v. Mares*, 402 F.3d 511, 516 (5th Cir. 2005); *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004). But each of those cases predates *Bruen*, which established a new historical paradigm for analyzing Second Amendment claims. Under the rule of orderliness, a later panel may overturn another panel's decision when it has "fallen unequivocally out of step with some intervening change in the law." *In re Bonvillian Marine Servs., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021). *Bruen* constitutes such a change, "rendering our prior precedent obsolete." *Rahimi I*, 61 F.4th at 451.

No. 23-50452

The government maintains that these earlier cases survive *Bruen* because they were decided at *Heller*'s step one—historical tradition—and not at its second step which was repudiated by *Bruen*. *See Darrington*, 351 F.3d at 633–34; *Bruen*, 597 U.S. at 19. But *Darrington* relied solely on *Emerson* for its Second Amendment analysis, and *Emerson* was decided based on the means-ends scrutiny that *Bruen* renounced. *See Emerson*, 270 F.3d at 261; *Bruen*, 597 U.S. at 22–24.[1] The Supreme Court in *Rahimi* declined to even mention *Emerson*, which would have been directly on point to its consideration of § 922(g)(8). The law of orderliness mandates that we abandon that prior precedent.

Even if our own case law is no longer binding, says the government, the Supreme Court has already weighed in on the constitutionality of § 922(g)(1) as well. To be sure, there is language in the cases described above that contrasts the regulations at issue with the regulation of felons' possessing firearms. In *Heller*, the Court wrote that "nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626. Multiple concurrences in *Bruen* reiterated the Justices' intent to leave undisturbed those government regulations that prohibit convicted felons from carrying firearms. *See, e.g.*, 597 U.S. at 81 (Kavanaugh, J., concurring). Finally, *Rahimi* cited *Heller*'s language to again state that prohibitions on possession of firearms by "felons and the mentally ill" are "presumptively lawful." 144 S. Ct. at 1902. The

---

[1] *Rahimi I* specifically identified *Emerson* as "applying some form of means-ends scrutiny *sub silentio*." 61 F.4th at 450. Courts have recently (post-*Rahimi*-reversal) relied on this reasoning, distinguishing cases such as *Emerson* that involve means-ends scrutiny. *See United States v. Alvarez*, Crim. No. H-20-297, 2024 WL 3166935, at *3 (S.D. Tex. June 25, 2024); *see also United States v. Petteway*, No. 24 Cr. 80 (AT), 2024 WL 3105006, at *2 (S.D.N.Y. June 24, 2024) (adopting the same logic, distinguishing cases not involving means-ends scrutiny, under Second Circuit precedent).

government makes much of this language, suggesting that it can begin and end our analysis.

However, because none of those cases actually concerned § 922(g)(1), they are not binding precedent on the issue now before us. The Court did not complete any historical analysis of laws forbidding felons from possessing firearms, as required by *Bruen*. The mentions of felons in those cases are mere dicta. *See Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) ("A statement is dictum if it 'could have been deleted without seriously impairing the analytical foundations of the holding' and 'being peripheral, may not have received the full and careful consideration of the court that uttered it.'" (quoting *Gochicoa v. Johnson*, 238 F.3d 278, 286 n.11 (5th Cir. 2000)). And although we recognized in *McRorey v. Garland* that we are generally bound by Supreme Court dicta, 99 F.4th 831, 837 (5th Cir. 2024), that dicta cannot supplant the most recent analysis set forth by the Supreme Court in *Rahimi*, which we apply today. Without precedent that conducts *Bruen*'s historical inquiry into our Nation's tradition of regulating firearm possession by felons in particular, we must do so ourselves.[2]

The government also raises the familiar argument that Diaz is not among "the people" protected by the Second Amendment. We disagree. There are two approaches to take in considering the constitutionality of gun regulations. As now-Justice Barrett has written in an oft-cited passage, one

---

[2] Not all courts agree with this proposition. The Eleventh Circuit has recently relied solely upon *Rahimi*'s mention of *Heller*'s "felons and the mentally ill" language in upholding the constitutionality of § 922(g)(1). *See United States v. Rambo*, No. 23-13772, 2024 WL 3534730, at *2 (11th Cir. July 25, 2024) (per curiam); *United States v. Young*, No. 13-10464, 2024 WL 3466607, at *9 (11th Cir. July 19, 2024) (per curiam); *United States v. Johnson*, No. 23-11885, 2024 WL 3371414, at *3 (11th Cir. July 11, 2024) (per curiam). We respectfully disagree with this approach—especially after *Rahimi*—and believe that a full historical analysis is required.

approach "uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away." *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting). *Bruen* mandates the second approach. *See* 597 U.S. at 70 (explaining that the right can be limited under certain circumstances, but that the government does not require citizens to "demonstrate a special need for self-protection" to be entitled to the right in the first place). "[A]ll people have the right to keep and bear arms," but "history and tradition support Congress's power to strip certain groups of that right." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). The Court in *Rahimi* affirmed this approach, assuming that Rahimi was protected by the Second Amendment even though he had committed "family violence." *See* 144 S.Ct. at 1898. As Justice Thomas remarked in his dissent, it was "*undisputed* that the Second Amendment applies to Rahimi . . . . [It] extends to 'the people,' and that 'that term unambiguously refers to all members of the political community, not an unspecified subset.'" 144 S. Ct. at 1933 (Thomas, J., dissenting) (emphasis added) (quoting *Heller*, 554 U.S. at 580); *see also id.* at 1907 (Gorsuch, J., concurring) ("In this case, no one questions that the law Mr. Rahimi challenges addresses individual conduct covered by the text of the Second Amendment.").

Diaz's status as a felon is relevant to our analysis, but it becomes so in *Bruen*'s second step of whether regulating firearm use in this way is "consistent with the Nation's historical tradition" rather than in considering the Second Amendment's initial applicability. *See Bruen*, 597 U.S. at 24. As in *Rahimi*, the "two-step" view of *Bruen* is effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation. *See Rahimi*, 144 S. Ct. at 1898.

No. 23-50452

### B.

Having disposed of the government's initial contentions, we reach the marrow of the case. We begin with Diaz's as-applied challenge, because it is "the narrower consideration." *See Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

The plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1), as it does with that of § 922(g)(8). *See Rahimi*, 144 S. Ct. at 1907 (Gorsuch, J., concurring). The burden thus shifts to the government to demonstrate that regulating Diaz's possession of a firearm is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. To satisfy this burden, the government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. Evidence must be "relevantly similar" to the challenged law. *Id.* at 29. In assessing similarity, we consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* The government identifies as relevant laws (1) focusing on how our Nation punished felons; and (2) disarming certain classes of persons.

For the purposes of assessing Diaz's predicate offenses under § 922(g)(1), we may consider prior convictions that are "punishable by imprisonment for a term exceeding one year." *See* § 922(g)(1). Diaz's pertinent criminal history consists of vehicle theft, evading arrest, and possessing a firearm as a felon. Both he and the government discuss various drug offenses in their briefing on his as-applied challenge, but those are not relevant for our purposes. In 2018 and 2020, Diaz was charged with possession of a controlled substance and possession with intent to deliver a controlled substance, but those charges were dismissed. He was convicted in state court of possession of less than two ounces of marijuana, but that is not a felony punishable by

more than one year, as required by § 922(g)(1). And count one of the conviction that Diaz appeals here (possession with intent to distribute) cannot serve as a predicate for his § 922(g)(1) charge in the same indictment; that charge must instead rely on previous history. Thus, the only relevant criminal convictions for our purposes are car theft, evading arrest, and possessing a firearm as a felon. To survive Diaz's as-applied challenge, the government must demonstrate that the Nation has a longstanding tradition of disarming someone with a criminal history analogous to this.

1. Punishment

The government first cites historical laws authorizing capital punishment and estate forfeiture as consequences for felonies. At the time of the Founding, the death penalty was "the standard penalty for all serious crimes." *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, The Death Penalty: An American History 23 (2002)); *see also Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death"). Colonies and states also routinely made use of estate forfeiture as punishment. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn. 275 & 276 (2014) (collecting statutes). The government asserts that, since these penalties imposed such severe burdens on the right to bear arms, the lesser burden of disarmament via § 922(g)(1) is consistent with our Nation's history and traditions.

At the outset, Diaz contends that laws about capital punishment and estate forfeiture are not relevant because *Bruen* directs courts to consider whether the regulation is "consistent with the Nation's historical tradition of *firearm* regulation." *See Bruen*, 597 U.S. at 17 (emphasis added). Diaz notes that every historical law that *Bruen* addressed was an "explicit firearm regulation." That makes sense because *Bruen* was addressing the

constitutionality of a statute that entirely constrained carrying firearms outside of the home, applicable to everyone equally. Section 922(g)(1), in contrast, focuses on a specific group of people, so we may consider laws regulating that group, even if they are not explicitly related to firearms. In *Rahimi*, the Court did just that, considering several historical laws that were not explicitly related to guns, yet sometimes applied to limit their possession. *See* 144 S. Ct. at 1899. For example, surety laws targeted various kinds of "misbehaviour," just as did rules allowing capital punishment. *See id.* None of those laws were passed *solely* for the purpose of regulating firearm possession or use.

At the time of our Nation's birth, "felony" was "a term of loose signification." THE FEDERALIST No. 42, at 228 (James Madison); *see also* Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 CLEV. ST. L. REV. 461, 465 (2009) (emphasizing the "ambiguity in the meaning of felony" at the Founding). The category was "a good deal narrower" then. *Lange v. California*, 594 U.S. 295, 311 (2021). "Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies." *Tennessee v. Garner*, 471 U.S. 1, 14 (1985). For example, possessing a firearm as a felon—one of Diaz's three predicate convictions justifying the application of § 922(g)(1)—was not considered a crime until 1938 at the earliest. *See* Federal Firearms Act, ch. 850, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938); An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87–342, § 2, 75 Stat. 757, 757 (1961). The fact that Diaz is a felon today, then, does not necessarily mean that he would have been one in the 18th century.

However, the government's evidence is more specifically targeted to Diaz's circumstances. It cites laws targeting the crime of theft, which was considered a felony at the time of the Founding and was punished accordingly. *See, e.g.*, 2 RECORDS OF THE COURT OF ASSISTANTS OF

No. 23-50452

THE COLONY OF THE MASSACHUSETTS BAY 1630–1692, at 32 (John Noble ed., 1904) (punishing theft by ordering, among other penalties, that "all his estate shalbe forfected"); Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664–65 (authorizing the death penalty for theft of chattels worth over five pounds). Our own research reveals that those convicted of horse theft—likely the closest colonial-era analogue to vehicle theft—were often subject to the death penalty. Kathryn Preyer, *Crime and Reform in Post-Revolutionary Virginia*, 1 LAW & HIST. REV. 53, 73 (1983). Those colonial-era laws correspond to the law against theft of a vehicle that serves as a predicate offense for Diaz's § 922(g)(1) charge. They establish that our country has a historical tradition of severely punishing people like Diaz who have been convicted of theft.

Addressing *Bruen*'s two "central considerations," the "why" of these examples aligns with the "why" of § 922(g)(1). As the government explains, these laws were "justified by the need to adequately punish felons, deter reoffending, and protect society from those proven untrustworthy to follow the law." The purpose of capital punishment in colonial America was threefold: deterrence, retribution, and penitence. *See* BANNER, *supra*, at 23. Virginia, for example, punished the crime of horse theft with the death penalty for the purpose of deterring the crime. ROBERT M. BOHM, DEATH-QUEST: AN INTRODUCTION TO THE THEORY AND PRACTICE OF CAPITAL PUNISHMENT 6 (1999). The precursor to § 922(g)(1), in turn, was enacted to "bar possession of a firearm from persons whose prior behaviors have established their violent tendencies." 114 CONG. REC. 14773 (daily ed. May 23, 1968) (statement of Sen. Russell Long of Louisiana). It was intended to keep firearms out of the hands of those who are "a hazard to law-abiding citizens" and who had demonstrated that "they may not be trusted to possess a firearm without becoming a threat to society." *Id.* The

justification for § 922(g)(1) is relevantly similar to that of the offered examples: to deter violence and lawlessness.

As to the "how," these laws achieved their goals by permanently punishing offenders, as does § 922(g)(1). Capital punishment is obviously permanent, and the majority of the estate forfeiture laws that the government cites did not provide an opportunity for offenders to regain their possessions.[3] Permanent disarmament under § 922(g)(1) does not punish such crimes "to an extent beyond what was done at the founding," given the government's evidence that crimes such as theft were punished so severely and permanently. *See Rahimi*, 144 S. Ct. at 1898. The Court in *Rahimi* was persuaded that, "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that § 922(g)(8) imposes is also permissible." *Id.* at 1902. Here, if capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible. These laws establish a historical tradition of permanently punishing certain offenders who the evidence shows would have been considered felons and exposed to these types of penalties at the time of the Founding.

We emphasize that our holding is not only premised on the fact that Diaz is a felon. Simply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny. The legislature has determined that the term "felony" encompasses all crimes punishable by more than one year of imprisonment, rendering Diaz a felon today. But not all felons today would have been considered felons at the Founding. Further,

---

[3] There are some exceptions. *See* Colgan, *supra*, at 332 n.276 (citing a 1718 Pennsylvania law allowing a forfeited estate to be returned to a "criminal's wife and children"). But, combined with the capital punishment examples and the going armed laws described below, it is clear that America has a tradition of permanent punishment.

No. 23-50452

Congress may decide to change that definition in the future. Such a shifting benchmark should not define the limits of the Second Amendment, without further consideration of how that right was understood when it was first recognized. At that time, at least one of the predicate crimes that Diaz's § 922(g)(1) conviction relies on—theft—was a felony and thus would have led to capital punishment or estate forfeiture. Disarming Diaz fits within this tradition of serious and permanent punishment.[4]

2. Firearms

We could stop here, as the punishment-focused laws discussed above demonstrate a historical tradition of severely punishing people like Diaz who would have been felons at the Founding. At least one court, though, has expressed concern that just because "Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Range v. Attorney General*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc), *vacated in light of* Rahimi, 144 S. Ct. 4706 (2024). In that court's view, "[t]he greater does not necessarily include the lesser." *Id.* We thus consider the government's proffered firearm-focused evidence as well, to further illuminate the "how" of our country's tradition of punishment. *See Bruen*, 597 U.S. at 29.

The government first identifies as relevant two proposals from state constitutional conventions: a speech from a minority group in Pennsylvania and an amendment offered by Samuel Adams of Massachusetts. *Heller* discussed both of these sources. *See* 554 U.S. at 604 (calling the Pennsylvania proposal "highly influential"). The Pennsylvania address suggested that

---

[4] Our opinion today does not foreclose future as-applied challenges by defendants with different predicate convictions.

citizens have a personal right to bear arms "unless for crimes committed, or real danger of public injury." Bernard Schwartz, The Bill of Rights: A Documentary History 662, 665 (1971). Massachusetts's proposed amendment said that the Constitution authorized "the people of the United States, who are peaceable citizens, [to keep] their own arms." *Id.* at 681. The government maintains that these contemporaneous examples support a national tradition of disarming those who are violent or pose a threat to public safety. However, relying solely on these types of unadopted proposals to establish a tradition is a "dubious" practice. *Heller*, 554 U.S. at 603. Nevertheless, taken together with the other evidence discussed herein, they do help to illuminate the "public understanding" of the Second Amendment around the time of its ratification. *See Bruen*, 597 U.S. at 20. They reveal that the right to bear arms at the time was not unlimited, and that the government could prevent people who had committed crimes or were "quarrelsome" from accessing weapons. *See* Samuel Johnson, A Dictionary of the English Language (5th Ed. 1773) (defining "unpeaceable").

The government also points to colonial-era statutes that prohibited going armed offensively and authorized forfeiture of weapons as punishment. *See, e.g.*, Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869); Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament 17 (1771); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794); A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99–100 (1836). These laws punished "those who had menaced others with firearms." *Rahimi*, 144 S. Ct. at 1900. Doing so "disrupted the 'public order' and 'le[d] almost necessarily to actual violence.'" *Id.* at 1901 (alteration in original) (quoting *State*

No. 23-50452

*v. Huntly*, 25 N.C. 418, 421–22 (1843) (per curiam)). *Rahimi* found these same going armed laws to be a relevant historical analogue to § 922(g)(8). *Id.*

The size of these laws' burden on the right to bear arms is comparable to that of § 922(g)(1). They both provide for permanent arms forfeiture as a penalty. *See, e.g.*, Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 53. Capital punishment and estate forfeiture were not the only severe penalties imposed on those who violated colonial-era laws. *Cf. Range*, 69 F.4th at 105. Imposing permanent disarmament as a punishment is also within our Nation's history and tradition. Applying § 922(g)(1) to Diaz "fits neatly" within that tradition. *See Rahimi*, 144 S. Ct. at 1901.[5]

Diaz complains that *Bruen* allows this type of reasoning-by-analogy only when the regulation in question was "unimaginable at the founding." *Bruen*, 597 U.S. at 28. He says that, because § 922(g)(1) does not address "unprecedented societal concerns or dramatic technological changes," only directly similar historical analogues should be considered. *Id.* at 27. This "bifurcated" approach has been rejected by the Supreme Court.[6] In *Bruen*, the Court noted that handgun possession for self-defense was a "straightforward historical inquiry," such that the historical analogues were "relatively simple to draw." 597 U.S. at 27. Even so, it compared the Second Amendment standard with the First and Sixth Amendments. *Id.* at 24–25. And, in *Rahimi*, the Court considered surety and going armed laws, despite the fact that

---

[5] We acknowledge that the justification behind going armed laws—to "mitigate demonstrated threats of physical violence"—does not necessarily support a tradition of disarming Diaz, whose underlying convictions do not inherently involve a threat of violence. *See* 144 S. Ct. at 1901. We focus on these laws to address the "how" of colonial-era firearm regulation, rather than the "why," which is supported by other evidence. *See Bruen*, 597 U.S. at 29.

[6] Justice Thomas, as the lone dissenting voice in *Rahimi*, advanced this interpretation. *See* 144 S. Ct. at 1933 (Thomas, J., dissenting).

No. 23-50452

domestic violence is not a new phenomenon. 144 S. Ct. at 1901; *see also id.* at 1904 (Sotomayor, J., concurring) ("[T]he Government has not identified a founding-era or Reconstruction-era law that specifically disarmed domestic abusers, but it did not need to do so." (citation omitted)). Going armed laws are relevant historical analogues to § 922(g)(1), just as *Rahimi* found them to be with respect to § 922(g)(8).

"Taken together," laws authorizing severe punishments for thievery and permanent disarmament in other cases establish that our tradition of firearm regulation supports the application of § 922(g)(1) to Diaz.[7] *See id.* Diaz's Second Amendment claim fails.

## C.

Diaz also brings a facial challenge to § 922(g)(1). To sustain a facial challenge, "the challenger must establish that no set of circumstances exists under which the statute would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). This Diaz cannot do, because the statute is constitutional as applied to the facts of his own case. *See Rahimi*, 144 S. Ct. at 1898.

## IV.

The government has met its burden to show that applying 18 U.S.C. § 922(g)(1) to Diaz is consistent with this Nation's historical tradition of firearm regulation. *See Bruen*, 597 U.S. at 17. At the time of the Second Amendment's ratification, those—like Diaz—guilty of certain crimes—like theft—were punished permanently and severely. And permanent disarmament was a part of our country's arsenal of available punishments at that time. Because

---

[7] Because the evidence discussed herein is sufficient to support a historical tradition of permanently disarming people like Diaz, we do not address the government's other historical examples.

No. 23-50452

applying § 922(g)(1) to Diaz "fits neatly" in this tradition, it is constitutional as applied and facially as well. *See Rahimi*, 144 S. Ct. at 1901.

Diaz's conviction is AFFIRMED.