# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

RONNIE DIAZ, JR.,
Defendant–Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

## UNITED STATES' RESPONSE TO
## PETITION FOR REHEARING EN BANC

JAIME E. ESPARZA
United States Attorney

LAUREN BRADLEY
Assistant United States Attorney
United States Attorney's Office
Western District of Texas

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney
General

LISA H. MILLER
Deputy Assistant Attorney General

MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
United States Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................i

TABLE OF AUTHORITIES ........................................................ii

INTRODUCTION ...................................................................... 1

BACKGROUND ......................................................................... 1

REASONS TO DENY THE PETITION ...................................... 7

    I.     The Panel Correctly Held That Section 922(g)(1) is Constitutional As Applied to Diaz. ............................................... 7

    II.    The Panel Correctly Held That Section 922(g)(1) is Constitutional on Its Face. ...................................................... 17

CONCLUSION ........................................................................ 19

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Central Pines Land Co. v. United States*,
    274 F.3d 881 (5th Cir. 2001) ................................................................. 16

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .................................................................... 9, 10, 15

*Folajtar v. Att'y Gen.*,
    980 F.3d 897 (3d Cir. 2020), *abrogated on other grounds by Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc), *remanded*, 144 S. Ct. 2706 (2024) ........................................................................................................ 12

*Johnson v. Lumpkin*,
    76 F.4th 1037 (5th Cir. 2023) ................................................................. 8

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ............................................................................... 10

*Medina v. Whitaker*,
    913 F.3d 152 (D.C. Cir. 2019) ............................................................... 14

*NYSRPA v. Bruen*,
    597 U.S. 1 (2022).................................................................. 2, 10, 11, 13

*Range v. Att'y Gen.*,
    69 F.4th 96 (3d Cir. 2023) (en banc), *vacated*, 144 S. Ct. 2706 (2024) .......... 8

*United States v. Canada*,
    103 F.4th 257 (4th Cir. 2024) ........................................................... 7, 17

*United States v. Diaz*,
    116 F.4th 458 (2024).................................. 4, 5, 6, 10, 11, 12, 14, 15, 16, 17

*United States v. Duarte*,
    101 F.4th 657 (9th Cir.), *vacated upon grant of reh'g en banc*, No. 22-50048, 2024 WL 3443151 (9th Cir. July 17, 2024)...................................... 8

*United States v. Dubois*,
 94 F.4th 1284 (11th Cir. 2024) ................................................................. 7

*United States v. Gay*,
 98 F.4th 843 (7th Cir. 2024) .................................................................... 8

*United States v. Goins*,
 --- F.4th ---, No. 23-5848, 2024 WL 4441462 (6th Cir. Oct. 8, 2024) ........... 8

*United States v. Jackson*,
 110 F.4th 1120 (8th Cir. 2024) ................................................................ 7

*United States v. Rahimi*,
 144 S. Ct. 1889 (2024) .......................... 1, 3, 4, 5, 6, 9, 10, 11, 13, 16, 17, 18

*United States v. Rahimi*,
 61 F.4th 443 (5th Cir. 2023), *rev'd*, 144 S. Ct. 1889 (2024) .................... 2, 16

*United States v. Salerno*,
 481 U.S. 739 (1987) .............................................................................. 17

*United States v. Williams*,
 113 F.4th 637 (6th Cir. 2024) .................................................................. 8

**Federal Statutes**

18 U.S.C. § 921 ...................................................................................... 15

18 U.S.C. § 922 ...............................................................................*passim*

*An Act to Establish the Post-Office and Post Roads within the United States*, ch.
 7, § 17 1 Stat. 232, 237 (1792) .............................................................. 12

**State Statutes**

*Act for Punishment of Horse-Stealers, and other Offenders*, 1744 Md. Laws 17 ...... 13

*Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664-65* .................................. 14

*An Act to Prevent the Stealing of Horses, Asses, and Mules*, 1789 S.C. Laws 37 ..... 13

Peter Wilson, *Acts of the General Assembly of the State of New-Jersey* 136 (1784) ............................................................................................... 13

Robert Watkins, *Digest of the Laws of the State of Georgia* 531-32 (1800) ........... 13

## Other Authorities

4 William Blackstone, *Commentaries on the Laws of England* (1769)................. 12

John H. Langbein, *Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources*, 50 Chi. L. Rev. 1 (1983)........................................ 12

## INTRODUCTION

Ronnie Diaz, Jr. was a thrice-convicted felon when he was caught with a firearm and ammunition. He was convicted of possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). The district court rejected his facial and as-applied Second Amendment challenges to that statute, and a panel of this Court affirmed.

This Court should deny Diaz's request for rehearing en banc. The panel correctly held that Section 922(g)(1) is constitutional as applied to him. That result accords with the majority of courts of appeals to consider the question and does not directly conflict with Supreme Court precedent. Diaz's contrary arguments misconstrue the panel opinion, misread the Supreme Court's Second Amendment precedents, and reprise the very methodological errors the Court identified and rejected in *United States v. Rahimi*, 144 S. Ct. 1889 (2024). And Diaz's claim that Section 922(g)(1) is facially unconstitutional dodges the difficult burden that accompanies facial challenges. Because Diaz cannot show that Section 922(g)(1) is unconstitutional in all of its applications, his facial challenge necessarily fails.

## BACKGROUND

1.    In November 2020, officers stopped a car Diaz was driving. ROA.499. During the stop, officers noticed a strong odor of marijuana

emanating from Diaz's car and saw empty baggies typically used for narcotics. ROA.499. After officers handcuffed Diaz, he admitted to having ammunition in his pocket. ROA.499. A search of Diaz's car revealed a pistol and drugs, including methamphetamine and heroin. ROA.499. At the time of the stop, Diaz had been convicted of three felonies: possessing a firearm as a felon, evading arrest with a vehicle, and theft of a vehicle. ROA.500, 502-04.

A grand jury charged Diaz with various drug and firearm offenses, including possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). ROA.17-18, 498. Diaz moved to dismiss the felon-in-possession charge, arguing under *NYSRPA v. Bruen*, 597 U.S. 1 (2022), that Section 922(g)(1) was unconstitutional on its face and as applied to him. ROA.143. The district court denied Diaz's motion. ROA.221. After a stipulated bench trial, the court found Diaz guilty of all charges, ROA.275-76, and sentenced him to 180 months of imprisonment, ROA.305-06.

2. On appeal, Diaz renewed his facial and as-applied Second Amendment challenges to Section 922(g)(1). In support, he relied on *Bruen* and this Court's intervening decision in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *rev'd*, 144 S. Ct. 1889 (2024), which applied *Bruen* to hold that 18 U.S.C. § 922(g)(8), the federal statute that prohibits firearm possession by individuals

who are subject to certain domestic violence restraining orders, facially violates the Second Amendment.

While Diaz's appeal was pending, the Supreme Court held that Section 922(g)(8) comports with the Second Amendment. *Rahimi*, 144 S. Ct. 1889. The Court explained that "some courts" had "misunderstood the methodology" of its Second Amendment cases and reaffirmed that those precedents "were not meant to suggest a law trapped in amber." *Id.* at 1897. Rather, *Rahimi* clarified that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. *Rahimi* thus instructed courts to assess whether a modern regulation "is consistent with the principles that underpin our regulatory tradition" when resolving Second Amendment questions. *Id.* at 1898.

Applying that methodology, the Supreme Court upheld Section 922(g)(8) on its face and as applied. *Id.* The Court cited "two distinct legal regimes" that support Section 922(g)(8)'s constitutionality: surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond"; and going armed laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Id.* at 1899-1901. The Court concluded that "[t]aken together, the surety and going armed laws confirm" that "[w]hen an individual poses a clear threat of physical violence to another, the

threatening individual may be disarmed." *Id*. at 1901. The Court acknowledged that Section 922(g)(8) is "by no means identical to these founding era regimes," but observed that "it does not need to be." *Id*. "Its prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id*.

The Supreme Court also reinforced that under its precedents, "the Government need only demonstrate that Section 922(g)(8) is constitutional in some of its applications" to defeat a facial Second Amendment challenge. *Id*. at 1898. Because the government proved that Section 922(g)(8) was "constitutional as applied to the facts of Rahimi's own case," *id*., the Court upheld the statute on its face.

3.     Following the Supreme Court's decision in *Rahimi*, a panel of this Court rejected Diaz's Second Amendment challenges to Section 922(g)(1). *United States v. Diaz*, 116 F.4th 458 (2024). The panel first determined that pre-*Bruen* circuit precedent upholding Section 922(g)(1) under the Second Amendment was no longer binding, *id*. at 465-66, and that the Second Amendment's text covered Diaz's conduct, *id*. at 466-67. The panel then held that "applying [Section 922(g)(1)] to Diaz is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 472.

The panel cited two relevant bodies of historical evidence. The first included "historical laws authorizing capital punishment and estate forfeiture as consequences for felonies." *Id.* at 467. The panel identified historical laws that imposed severe penalties for theft and determined that those laws "establish that our country has a historical tradition of severely punishing people like Diaz who have been convicted of theft." *Id.* at 468-69. According to the panel, those laws were "relevantly similar" to Section 922(g)(1) because both were enacted "to deter violence and lawlessness," and both "achieved their goals by permanently punishing offenders." *Id.* at 469. The panel used reasoning mirroring *Rahimi*'s to explain why capital punishment laws and Section 922(g)(1) imposed analogous burdens. *Rahimi* noted that historical "going armed laws provided for imprisonment" and explained that if imprisonment was a permissible punishment, "then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Rahimi*, 144 S. Ct. at 1902. Likewise, the panel explained, because "[c]apital punishment is obviously permanent," and many estate forfeiture laws "did not provide an opportunity for offenders to regain their possessions," the "lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." *Diaz*, 116 F.4th at 469.

The second set of analogues included "firearm-focused evidence," including going armed laws and precursors to the Second Amendment proposed

at state ratifying conventions. *Id.* at 470. The panel reasoned that Second Amendment precursors, "taken together with the other evidence discussed" in the panel's opinion, "reveal that the right to bear arms at the time [of the founding] was not unlimited," but instead suggested "that the government could prevent people who had committed crimes or were 'quarrelsome' from accessing weapons." *Id.* And going armed laws reveal that "[c]apital punishment and estate forfeiture were not the only severe penalties imposed on those who violated colonial-era laws." *Id.* at 471. Accordingly, those laws were relevantly similar to Section 922(g)(1) and justified disarming Diaz. *Id.*

Having resolved Diaz's as-applied challenge, the panel also rejected his facial challenge. *Id.* at 471-72. The panel explained that "because the statute is constitutional as applied to the facts of [Diaz's] own case," he could not show that the statute was facially invalid. *Id.* at 472 (citing *Rahimi*, 144 S. Ct. at 1898).

Throughout its opinion, the panel reiterated the limited scope of its holding. The panel explained that "[b]ecause the evidence discussed" in its opinion was "sufficient to support a historical traditional of permanently disarming people like Diaz," the panel did not need to address "the government's other historical examples." *Id.* at 471 n.7. And the panel noted that its opinion did not "foreclose future as-applied challenges by defendants with different predicate convictions." *Id.* at 470 n.4.

## REASONS TO DENY THE PETITION

**I.    The Panel Correctly Held That Section 922(g)(1) is Constitutional As Applied to Diaz.**

The panel correctly held that Section 922(g)(1) is constitutional as applied to Diaz. Assuming that felons are covered by the Second Amendment's text, *but see* Gov't Br. 12-20, they may be disarmed consistent with our Nation's historical tradition of firearm regulation. Under *Rahimi*'s principles-based approach, Section 922(g)(1) is consistent with two historically derived principles: (1) legislatures may disarm individuals convicted of serious offenses, and (2) legislatures may disarm those whose firearm possession presents a special danger of misuse. *See* Gov't Br. 20-40; Gov't Supp. Ltr. Br. 3. Under either principle, Section 922(g)(1) is constitutional in all of its applications, including as applied to Diaz.

Although the panel adopted a narrower approach to the historical analysis than the government believes is appropriate under *Rahimi*, the panel's limited holding that the Second Amendment permits disarming Diaz is correct and does not warrant further review. That holding is consistent with most other circuits to resolve the question of Section 922(g)(1)'s constitutionality, which have upheld the statute on its face, *see United States v. Canada*, 103 F.4th 257 (4th Cir. 2024), in all of its applications, *see, e.g.*, *United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024); *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024), or

as applied to defendants with a variety of felony convictions, *see United States v. Williams*, 113 F.4th 637, 662 (6th Cir. 2024) (convictions for aggravated robbery, attempted murder, and felon-in-possession); *United States v. Goins*, --- F.4th ---, No. 23-5848, 2024 WL 4441462, *1 (6th Cir. Oct. 8, 2024) (conviction for recidivist drunk driving); *United States v. Gay*, 98 F.4th 843, 847 (7th Cir. 2024) (defendant with 22 felonies). *But see United States v. Duarte*, 101 F.4th 657, 661-63 (9th Cir.), *vacated upon grant of reh'g en banc*, No. 22-50048, 2024 WL 3443151 (9th Cir. July 17, 2024); *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc), *vacated*, 144 S. Ct. 2706 (2024).

Diaz does not contend with these precedents, but instead nitpicks the panel opinion in an attempt to manufacture conflict between the panel's reasoning and Supreme Court precedent. Diaz's criticisms of the panel opinion do not warrant the "extraordinary procedure" of en banc review. *Johnson v. Lumpkin*, 76 F.4th 1037, 1039 (5th Cir. 2023) (quotation marks omitted). And they lack merit in any event.

A.     Diaz argues (Pet. 5-9) that the panel opinion's reliance on historical capital punishment and estate forfeiture laws conflicts with Supreme Court precedent in three ways. None establishes a conflict that merits rehearing en banc.

1.    First, Diaz maintains (Pet. 5-6) that Supreme Court precedent prohibited the panel from considering felony-punishment laws at all because they are not "firearm regulations." But the Supreme Court has never suggested that historical gun laws are the only probative source for assessing whether a modern regulation comports with the Second Amendment. To the contrary, the Court has consulted "a variety of legal and other sources" in assessing the Second Amendment's scope. *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008); *see also id*. at 598-619 (discussing a variety of sources, including English history, commentary, legislative debates, and case law).

*Rahimi* supports this reasoning. *Contra* Pet. 6. As the panel opinion explained, *Rahimi* relied on the historical surety regime to sustain Section 922(g)(8), even though that tradition was not limited to "target[ing] the misuse of firearms." *Rahimi*, 144 S. Ct. at 1900. That the surety tradition later specifically targeted the misuse of firearms made *Rahimi* "an easy case." *Id*. at 1904 (Sotomayor, J., concurring). But it did not limit the scope of historical evidence courts may consider in assessing what the Second Amendment right was originally understood to protect. *See id*. at 1912-13 (Kavanaugh, J., concurring).

Diaz's claim (Pet. 6-7) that the panel strayed by relying on *Rahimi*'s "greater-includes-the-lesser" reasoning is misguided. According to Diaz,

historical punishment laws and Section 922(g)(1) have different purposes, so that analogical reasoning does not work in this case. But the purposes of historical felony-punishment laws and Section 922(g)(1) "align[]." *Diaz*, 116 F.4th at 469. Capital punishment and estate forfeiture laws were "justified by the need to adequately punish felons, deter reoffending, and protect society from those proven untrustworthy to follow the law." *Id.* Likewise, Section 922(g)(1) was enacted to "keep firearms out of the hands of those who are a 'hazard'" and "who had demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.'" *Id.* Section 922(g)(1) is thus "relevantly similar" to historical punishment laws. *Id.*

2.     Second, Diaz claims that the panel's reliance on capital punishment and estate forfeiture laws treats the right to bear arms as a "second-class right" in contravention of Supreme Court precedent. Pet. 7-9. But the Court has repeatedly recognized that the right to bear arms "is not unlimited." *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 21; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *Rahimi*, 144 S. Ct. at 1897. And the Court has specifically characterized felon-in-possession laws as "presumptively lawful," *Rahimi*, 144 S. Ct. at 1902, and emphasized that its opinions should not be taken to "cast doubt" on their constitutionality, *Heller*, 554 U.S. at 626. Nothing about the Supreme Court's precedents undermine the relevance of capital punishment and estate forfeiture

laws in assessing Section 922(g)(1)'s constitutionality under the Second Amendment.

Nor does the panel's reliance on those laws to disarm Diaz undermine other fundamental rights. *But see* Pet. 8-9. The Second Amendment's scope derives from history that is distinct from that underlying other constitutional protections, and each challenged law must itself find footing in the historical record. *See Bruen*, 597 U.S. at 24. The panel properly relied on those laws to uphold Section 922(g)(1) as applied to Diaz. *Diaz*, 116 F.4th at 467-69.

3.    Third, Diaz contends (Pet. 9) that three historical laws severely punishing thieves were not enough to justify Section 922(g)(1)'s application to him. But the Supreme Court's Second Amendment precedents do not establish a minimum number of historical analogues the government must provide to justify a modern regulation. *Cf. Rahimi*, 144 S. Ct. at 1901 (relying on four founding-era laws codifying "prohibitions on going armed"). That is especially so where the historical record lacks contrary evidence suggesting that a challenged statute is inconsistent with our nation's historical tradition. That was the case in *Bruen*: the Court "doubt[ed] that three colonial regulations" could establish a historical tradition permitting New York to prohibit public carry because there was a body of evidence indicating that public carry was generally permitted at the founding. *Bruen*, 597 U.S. at 46 (emphasis omitted). That is not

the case here. History does not suggest that the founders would have viewed disarming felons as inconsistent with the Second Amendment.

In any case, the panel's opinion provided representative examples of severe punishment for various forms of theft, not an exhaustive list. There is ample historical evidence to support the panel's conclusion. Larceny was one of the "nine traditional felonies at common law" and subjected a person to capital punishment or estate forfeiture. *Folajtar v. Att'y Gen.*, 980 F.3d 897, 904 n.9 (3d Cir. 2020), *abrogated on other grounds by Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc), *remanded*, 144 S. Ct. 2706 (2024); 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Although England "largely eliminated the death penalty from the punishment of grand larceny" by 1717, John H. Langbein, *Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources*, 50 Chi. L. Rev. 1, 37 (1983), by the time of the founding, American jurisdictions punished various types of larceny with death or estate forfeiture. For example, the Second Congress punished with death theft of the mail. *An Act to Establish the Post-Office and Post Roads within the United States*, ch. 7, § 17 1 Stat. 232, 237 (1792). And as the panel explained, "those convicted of horse theft . . . were often subject to the death penalty." *Diaz*, 116 F.4th at 468. Not only did Virginia expose horse thieves to severe punishment, *id.*, but so did

Maryland, New Jersey, South Carolina, and Georgia, among other jurisdictions.[1]

B.    Diaz criticizes (Pet. 9-10) the historical laws on which the panel relied by identifying aspects of those laws that he believes undermine their value as analogues. But his divide-and-conquer approach contrasts with the analogical reasoning *Rahimi* requires, which instructs courts to derive historical "principles underlying the Second Amendment" based on all available historical evidence "[t]aken together." *Rahimi*, 144 S. Ct. at 1898, 1901. And his insistence that historical laws match Section 922(g)(1) in every respect runs counter to the Court's assurances that "a 'historical twin' is not required." *Id.* at 1903 (quoting *Bruen*, 597 U.S. at 30). Rather, Diaz echoes the approach of the lone Justice who dissented in *Rahimi*, who criticized the Court for "cobbl[ing] together" historical laws to discern a relevant principle rather than demanding a closer match to "a single historical law." *Id.* at 1944 (Thomas, J., dissenting); *cf.* Pet. 11, 13 (citing *Rahimi* dissent).

At any rate, Diaz is wrong about the historical evidence. Diaz claims the panel's representation that horse thieves "were often subject to the death

---

[1] *See, e.g.*, *Act for Punishment of Horse-Stealers, and other Offenders*, 1744 Md. Laws 17; Peter Wilson, *Acts of the General Assembly of the State of New-Jersey* 136 (1784); *An Act to Prevent the Stealing of Horses, Asses, and Mules*, 1789 S.C. Laws 37; Robert Watkins, *Digest of the Laws of the State of Georgia* 531-32 (1800).

penalty" was wrong because "hardly any horse thieves were executed" in Virginia at the founding. Pet. 9 (emphasis omitted). But the fact that the death penalty was not invariably imposed does not undermine the fact that legislatures believed that death was a permissible consequence for horse theft. Thus, it stands to reason that founding-era legislatures would not have perceived the lesser punishment of disarmament as inconsistent with the Second Amendment. *See Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (observing that "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms").

Diaz says the founding-era New York law the panel relied on "does not authorize the death penalty for theft." Pet. 10. But as Diaz acknowledges (Pet. 10 n.1), and as the panel correctly recognized, *Diaz*, 116 F.4th at 468, the New York law *did* authorize capital punishment for theft of chattels exceeding "the value of five pounds." Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664-65. That it did so after a second offense does not undermine the prevailing view that theft could be punished severely.

Finally, Diaz misreads the panel opinion to characterize estate forfeiture as a "permanent" consequence. Pet. 11. The panel actually determined that estate forfeiture laws "combined with" other historical evidence demonstrate a

tradition of permanent punishment. *Diaz*, 116 F.4th at 469 n.3. Diaz claims that individuals subject to total estate forfeiture could nevertheless procure arms after reintegrating into society. Even assuming Diaz is correct, that would not undermine estate forfeiture laws as probative historical sources: their burden would still be similar to Section 922(g)(1), which itself preserves avenues for individuals with felony convictions to regain arms. *See, e.g.*, 18 U.S.C. § 921(a)(20).

C. Diaz next challenges the panel's reliance on firearms-focused evidence. Pet. 11-15. He contends that the panel incorrectly cited Second Amendment precursors, which he says do not inform the Amendment's meaning. But the Supreme Court has explained that the Second Amendment was "widely understood to codify a pre-existing right, rather than to fashion a new one," and it has found it unlikely that "different people of the founding period had vastly different conceptions" of that right. *Heller*, 554 U.S. at 603-05. Indeed, the Court in *Heller* described the Pennsylvania Anti-Federalists' proposal as "highly influential" and relied on it in interpreting the Second Amendment. *Id*. at 604. The panel correctly determined that "taken together with . . . other evidence," these precursors "help to illuminate the 'public understanding' of the Second Amendment around the time of its ratification." *Diaz*, 116 F.4th at 470.

Diaz incorrectly insists (Pet. 13 n.2) that this Court's previous rejection of Second Amendment precursors as relevant historical sources in *Rahimi*, 61 F.4th at 457, remains good law. It does not. When the Supreme Court reversed in *Rahimi*, it rejected not just this Court's holding but also its methodology. *Rahimi*, 144 S. Ct. at 1897, 1903. Because the Supreme Court explicitly rejected how the panel assessed the historical evidence, *id.*, the panel's assessments of that evidence cannot stand. *Central Pines Land Co. v. United States*, 274 F.3d 881 (5th Cir. 2001), does not suggest otherwise. That decision provides only that where the Supreme Court reverses a panel's opinion on one of multiple grounds, the remaining parts of the opinion remain binding. *Id.* at 894. That is not the case here.

Diaz also contends that going armed laws' burdens are too different from Section 922(g)(1) to be proper analogues. Pet. 13-14. Diaz again echoes the erroneous reasoning of the *Rahimi* dissent by considering this historical analogue in isolation and demanding an overly specific match with Section 922(g)(1). *Rahimi*, 144 S. Ct. at 1897-98, 1903. But even assuming going armed laws themselves did not provide for permanent disarmament, the panel correctly determined that, like capital punishment and estate forfeiture, they authorized "severe penalties" on "those who violated colonial-era laws." *Diaz*, 116 F.4th at 471.

Finally, Diaz reprises his argument that Section 922(g)(1) is unconstitutional as applied to him based on his "non-violent" felonies. Pet. 16. Diaz's characterization of his felony convictions as "non-violent" downplays the seriousness of his offenses, which demonstrate his disregard for the physical safety of others. *See* Gov't Br. 40-44; Gov't Supp. Ltr. Br. 6; ROA.230.

## II. The Panel Correctly Held That Section 922(g)(1) is Constitutional on Its Face.

The panel correctly held that because Section 922(g)(1) is constitutional as applied to Diaz, the statute is facially constitutional. *Diaz*, 116 F.4th at 471-72 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987), and *Rahimi*, 144 S. Ct. at 1898). Diaz resists this outcome, contending that because Section 922(g)(1) is "historically unprecedented," it is necessarily unconstitutional on its face. Pet. 15-16. Diaz's reasoning ignores the Supreme Court's admonition in *Rahimi* that a statute is constitutional on its face where it may be constitutionally applied in some circumstances. 144 S. Ct. at 1898. Thus, to demonstrate that a statute is facially unconstitutional, a defendant must "establish that no set of circumstances exists under which the Act would be valid." *Id.* This is "the 'most difficult challenge to mount successfully.'" *Id.* (quoting *Salerno*, 481 U.S. at 745). And Diaz cannot meet that heavy burden here. *Diaz*, 116 F.4th at 471-72; *see also Canada*, 103 F.4th at 258-59.

Diaz's description of Section 922(g)(1) as "historically unprecedented" would not be a reason to hold the statute facially unconstitutional in any event. His flawed reasoning "assumes that founding-era legislatures maximally exercised their power to regulate" and endorses "a 'use it or lose it' view of legislative authority." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring). As the *Rahimi* majority emphasized, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. Because Section 922(g)(1) is "consistent with the principles that underpin our regulatory tradition," *id.* at 1898, it survives Diaz's Second Amendment challenge.

# CONCLUSION

This Court should deny Diaz's petition for rehearing en banc.

Respectfully submitted,

JAIME E. ESPARZA
United States Attorney

LAUREN BRADLEY
Assistant United States Attorney
United States Attorney's Office
Western District of Texas

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney
General

LISA H. MILLER
Deputy Assistant Attorney General

/s/ Mahogane D. Reed
MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
United States Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limitations of Federal Rules of Appellate Procedure 35(b)(2) and (e) because it contains 3,899 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point type Calisto MT font.

/s/ Mahogane D. Reed
MAHOGANE D. REED